ALLEN J. LABBE ET AL. *v.* PENSION COMMISSION
OF THE CITY OF HARTFORD ET AL.
(15275)

Peters, C. J., and Borden, Berdon, Norcott and Palmer, Js.

Argued March 19—decision released August 20, 1996

*Leon M. Rosenblatt*, for the appellants (named plaintiff et al.).

*Karen K. Buffkin*, assistant corporation counsel, with whom, on the brief, was *Pedro E. Segarra*, corporation counsel, for the appellees (named defendant et al.).

*Scott R. Chadwick*, with whom, on the brief, was *Frank J. Szilagyi*, for the appellee (defendant Hartford Police Union).

BORDEN, J. The dispositive issues in this appeal are whether: (1) the trial court, *Freed, J.*, properly granted a motion by the defendants, the Hartford pension commission (commission) and the city of Hartford (city), to dismiss the case against them for lack of subject matter jurisdiction; and (2) the trial court, *Aurigemma, J.*, properly set aside a jury verdict in favor of the plaintiffs and rendered judgment for the defendant, the Hartford police union (union). The plaintiffs,[1] Allen J. Labbe,

---

[1] Originally there were fourteen plaintiffs, including: Allen J. Labbe, John Murdock, Jeffrey P. Rohan, Patrick J. Sullivan, Donald G. Sancomb, Edward Prevost, Raymond J. Feeney, Jr., John D. Raphael, James Jackson, Peter M. Hopkins, Gerry Pleasent, Ralph Amador, Daniel J. Albert, and Eddie M. Rivera. Albert withdrew from the case prior to the start of trial, and counsel withdrew from representation of Rohan prior to the start of trial. The record

John Murdock, John D. Raphael, Gerry Pleasent and Eddie M. Rivera, appeal from both of those judgments. With respect to Labbe, Murdock, Raphael and Pleasent, we conclude that their appeal from the judgment of dismissal is moot. With respect to Rivera, we conclude that the trial court properly dismissed the case against the city and the commission. With respect to all of the plaintiffs, we conclude that the trial court properly set aside the verdict against the union. Accordingly, with respect to Labbe, Murdock, Raphael and Pleasent, we dismiss their appeal from the judgment of Judge Freed dismissing their case against the city and commission. With respect to Rivera, we affirm the judgment of Judge Freed. With respect to Labbe, Murdock, Raphael, Pleasent and Rivera, we affirm the judgment of Judge Aurigemma setting aside the verdict and rendering judgment for the union.

The underlying dispute between the parties involves the question of whether the plaintiffs, all current or former Hartford police officers and Vietnam era military veterans, could add their periods of military service to the time that they had served as police officers in order to reach the time needed to qualify for normal retirement, that is, to receive a city pension immediately upon retiring. Judge Freed dismissed, for failure to exhaust contractual remedies, the plaintiffs' complaint against the city and the commission alleging breach of a collective bargaining agreement. Following a trial in which the jury returned a verdict in favor of the plaintiffs on their complaint against the union alleging breach of both the union's duty of fair representation and the union's bylaws, Judge Aurigemma set aside the verdict and rendered judgment for the union.

does not indicate how the claims of Sullivan, Sancomb, Prevost, Feeney, Jackson, Hopkins and Amador were disposed of, but at the time the jury verdict was rendered, only Labbe, Murdock, Raphael, Pleasent and Rivera remained as plaintiffs. This appeal, therefore, concerns only those five plaintiffs.

The following facts and procedural history are undisputed. In 1987, at the time that the collective bargaining agreement that is at dispute in this action was negotiated, the plaintiffs were all employed as police officers by the city and were all members of the union, which was the exclusive collective bargaining representative for police officers. The plaintiffs' employment was at all times subject to the terms of a collective bargaining agreement, which was periodically negotiated between the city and the union. The commission administers the municipal employees' retirement fund to which all police officers belong, and which is financed in part under the terms of the collective bargaining agreement between the city and the union.

In October, 1987, the union and the city entered into a collective bargaining agreement effective July 1, 1987, through June 30, 1990. This agreement amended certain provisions of the preceding collective bargaining agreement with respect to pension benefits.[2] The

[2] Section 3.6 c of the collective bargaining agreement provides in relevant part: "Pensions

"Effective July 1, 1988, for all persons who became sworn police officers prior to July 1, 1987, all present retirement and survivor benefits shall remain in effect except as follows . . .

"2. Service retirements for those employees hired before July 1, 1984 will be based upon 2.65% of final average pay for each whole year of service for the twenty (20) years of continuous service and, the following table for each whole year of continuous service thereafter to a maximum of 70% of final average pay.

| Year | Percentage |
| --- | --- |
| 21 | 56% |
| 22 | 58% |
| 23 | 60% |
| 24 | 62% |
| 25 | 64% |

* * *

"3. Normal retirement for employees hired before July 1, 1984 shall be after twenty (20) years of continuous service. Employee pension benefits vest after ten (10) years of continuous service.

"4. An employee who vests his or her pension and leaves the service of the City will be entitled to collect a pension benefit commencing on the

agreement contained a new provision that provided any veteran of the armed services who had served during time of war with the opportunity to purchase up to four years of military time to be used in the calculation of the police officer's city pension.

During casual discussions among police officers, a question arose as to whether military time could be used "up front," that is, to reduce the twenty years needed to qualify for normal retirement, or whether it could be used only "on the back end," that is, to increase the total amount of pension to be paid after an officer reached normal retirement, but not to reduce the time that an officer was required to work in order to be eligible for normal retirement. Some of the officers were aware that veterans of World War II had been permitted to purchase military time and apply it up front.[3] They wondered whether, pursuant to the collective bargaining agreement, Vietnam era veterans would be permitted to do the same.

In early July, 1988, Labbe met with Thomas Grodecki in order to discuss his retirement plans. Grodecki was

---

date he or she would have reached his or her normal retirement date.

"5. An employee may purchase up to four (4) years of Military Service time for service in the Armed Forces of the United States for periods of service, any of which occurred during the periods set forth in Section 27-103 of the General Statutes of the State of Connecticut, at the rate payable at the time of entry into City service, with interest at the rate of 7% per annum. The period of such service for which the employee receives credit shall be counted for the purpose of computing the amount of his or her retirement allowance provided such employee shall have completed (10) years of continuous service or fifteen (15) years of active aggregate service with the City of Hartford or shall be retired prior thereto, due to disability incurred in the course of his or her employment."

[3] It is not disputed that veterans of World War I and World War II were permitted to purchase military time and apply it up front. They were granted this right by state legislative enactment. See 34 Spec. Acts 270, No. 242 (1969); 28 Spec. Acts 581, No. 521 (1957). In 1961, the Hartford city council adopted what is now § 2-188 of the Hartford municipal code, which gave to veterans of the Korean conflict a similar right.

the vice president of the union, was a member of the commission, and had been a member of the union's negotiating team for the collective bargaining agreement. He was the union official considered to be the most knowledgeable about pensions. At the time he met with Grodecki, Labbe had been employed by the city for approximately seventeen years, and had the option of purchasing three years and ten months of military time to be applied to his pension benefits. Labbe and Grodecki discussed whether, pursuant to the agreement, Labbe would be permitted to use his military time up front and, therefore, be able to retire immediately with full pension benefits.[4] After speaking with Grodecki, Labbe then went to the office of the city treasurer, where he spoke to Terry McNamara and David Cameron, who are pension counselors, about purchasing his military time and using it up front. McNamara then calculated the amount that Labbe would be required to pay in order to purchase his military time. Labbe then went to his credit union, where he took out a loan for approximately $6800, and used that money to purchase his military time.

On July 13, 1988, Labbe submitted a letter of resignation to the chief of police, Bernard Sullivan, effective

---

[4] The fact that Labbe spoke to Grodecki and city officials about using military time is not in dispute. The content of the conversations is in dispute and is discussed in part II of this opinion. Certain of the other plaintiffs also spoke with union officials about the ability to use military time up front.

Murdock had been a police officer since January, 1973, and was eligible to purchase two years and two months of military time. In 1988, he was making plans to retire in November, 1990, at which point he believed his city service combined with his military time would give him the twenty years needed for normal retirement. Between May, 1988, and July, 1988, he spoke with various union officials, including Grodecki, James Quigley and Dennis O'Brien, about whether he could use his military time up front.

Pleasent had been a police officer since September 2, 1969, and was eligible to purchase four years of military time. Several times during 1987 or early 1988, he spoke to Grodecki about using his military time up front.

Rivera had been a police officer since August 16, 1985, and was eligible

October 11, 1988, the date on which Labbe believed that his years working for the police department, combined with his military time, gave him the requisite twenty years needed for normal retirement. Sullivan returned the letter to Labbe with a notation that Labbe did not have sufficient time to qualify for normal retirement and inquired whether it was Labbe's intention to retire without being able to collect a pension immediately.

At some time between the ratification of the collective bargaining agreement in October, 1987, and August 5, 1988, the city manager, Alfred Gatta, and the union had taken different positions about the rate at which military time would increase pension benefits. Gatta, who had not been part of the negotiating team for the city, claimed that the agreement provided that military time should be paid at the rate of 2 percent per year, but the union claimed that it should be paid at the rate of 2.65 percent per year. Officials of the city and the union held an unspecified number of meetings during that time period in order to determine the rate at which military time would be paid.

On August 5, 1988, officials of the city and the union entered into an agreement (August agreement), that provided that military time would be paid at the rate of 2.65 percent per year. The August agreement also indicated that military time could not be used up front.[5]

to purchase one year and eleven months of military time. In late 1987, Rivera spoke to Quigley about using military time up front.

[5] The August agreement provided in relevant part: "AGREEMENT

"The HARTFORD POLICE UNION and the CITY OF HARTFORD hereby agree as follows:

"1. Solely for the purposes of this agreement the parties agree that the pension lockout, Section 3.6d Pension, of the collective bargaining agreement shall not prevent operation of the following sections concerning military buyback.

"2. For officers sworn before July 1, 1987 and listed in the letter of understanding for pension benefits for certain employees, such employees may purchase qualified military time in accordance with requirements of section 3.6a (7) at 2.65% per year and military time so purchased will not be subject to the maximum 70% of final average pay pension cap.

The only union members who participated in the negotiation of the August agreement were James Quigley, the president of the union, and Grodecki. At the time of the August agreement, Quigley had been a police officer for eighteen years and eleven months, and had purchased two years and two months of military time, and Grodecki had been a police officer for twenty years and two months, and had purchased two years of military time. Grodecki, therefore, had already reached his normal retirement date, and Quigley was within approximately one year of his normal retirement date. Although union members did not have an opportunity to vote on the August agreement, Grodecki immediately posted notices informing them about the August agreement.[6]

On September 26, 1988, Labbe submitted a second letter of resignation to Sullivan, who accepted this resig-

"3. For officers sworn prior to July 1, 1987 who are not part of the letter of understanding referred to in paragraph 2, above, the provisions of paragraph 2, above, shall apply except that military time so purchased shall be subject to the maximum 70% of final average pay pension cap.

"4. For officers sworn after July 1, 1987, employees shall purchase years of service which are added to the total years of service at the time of retirement and the retirement allowance shall be determined by the scale existing at the time of retirement and subject to the maximum 70% of final average pay pension cap.

"5. All officers who were employed as of the date of this agreement shall notify the city of intent to purchase military time on or before the expiration date of the collective bargaining agreement, June 30, 1990. Employees hired after the date of this agreement shall notify the city of intent to purchase military time within one year of their date of hire or date of discharge from military service, whichever is later.

"6. Any eligible military service purchased by a police officer shall be added to the officer's years of service at retirement and shall not be counted towards the required length of service for normal retirement.

"7. All other provisions of the collective bargaining [agreement] concerning pensions shall continue in full force and effect and shall not be altered by this agreement."

[6] The notice posted by Grodecki provided in relevant part: "NOTICE
"Basic Provisions of Military Buyback Credit:
"2.65 % per yr. up to 4 yrs. for members sworn before July 1, 1987
"2.00 % per yr. up to 4 yrs. for members sworn after July 1, 1987

nation. Although Labbe later attempted to withdraw his resignation, the city discharged Labbe on October 14, 1988, and Sullivan did not forward his application for pension benefits to the commission. In December, 1988, Labbe submitted an application for benefits directly to the commission. The commission sought guidance from Eunice Groark, corporation counsel for the city, about how to respond to Labbe's application. The commission subsequently rejected Labbe's application for a pension. As a result, Labbe was required to wait until October 10, 1991, his normal retirement date, to begin receiving pension benefits. Once he began receiving his pension, however, Labbe received an additional $4400 per year as a result of the August agreement that provided that military time would increase pension benefits by 2.65 percent per year.

On May 22, 1989, the plaintiffs filed an eight count complaint against the commission, the city and the union, alleging a variety of constitutional and contractual claims,[7] including claims that the city and the com-

"Members must notify the City of their intention to buy back military credit on or before June 30, 1990.

"Members hired after the signing of this agreement must arrange to buy back military service within their first year of employment. This only [a]ffects people who are not now employees of the Police Department.

"READ CAREFULLY

"After careful review of the City Charter provision for Military Credit and the practice of the Pension Commission relative to granting Military Buyback Credit, it was determined by the City and the Union that no Military Credit was given to any retiree to shorten his length of service with the City, except for those members who had reached or pas[sed] the qualifying age of 55. Given those facts, specific Charter language and past practice it was mutually agreed that MILITARY SERVICE CANNOT BE USED TO REDUCE THE REQUIRED NUMBER OF YEARS OF CITY SERVICE FOR RETIREMENT PURPOSES.

"We will schedule a SPECIAL Meeting in the near future to discuss the particulars of this mutual agreement and to answer any questions with FACTS rather that the collection of interpretations that have been circulated."

[7] Count one of the complaint alleged that the defendants had violated article first, § 1, of the Connecticut constitution by giving public emoluments

mission had breached the terms of the collective bargaining agreement, and that the union had breached both the duty of fair representation and its bylaws. Specifically, the plaintiffs claimed that: (1) the provisions of the collective bargaining agreement permitting the purchase of military time gave them the right to use that time up front, and that the city and the commission had violated the terms of that agreement by determining that military time could not be used up front; (2) in entering into the August agreement, the union improperly had bargained away the right to use military time up front that had been provided in the collective bargaining agreement; and (3) the union's participation in the August agreement violated its bylaws, which require that all collective bargaining agreements be presented to the membership for approval. The plaintiffs sought, inter alia, a declaratory judgment that the collective bargaining agreement permits Vietnam era veterans to apply their military time up front, as well as damages, including full pension benefits for Labbe retroactive to October 14, 1988.

and privileges to World War II veterans and other city employees, but denying such benefits to Vietnam era veterans.

Count two alleged that the defendants had violated the state and federal constitutions by denying the plaintiffs their property and liberty interests without due process of law.

Count three alleged that the defendants had violated the state and federal constitutions by denying the plaintiffs equal protection of the law.

Count four alleged that the commission had breached the pension agreement by denying the plaintiffs the opportunity to purchase military service time to reduce the time needed for normal retirement.

Count five alleged that the city had breached the collective bargaining agreement by denying the plaintiffs the opportunity to use their military time to reduce the time needed for normal retirement.

Count six alleged that the union had breached its duty to represent the plaintiffs fairly.

Count seven alleged that the union had breached its bylaws by entering into the August agreement with the city without obtaining approval of the union members.

Count eight alleged that the city and the union had tortiously interfered with the business, economic and contractual relationship between the plaintiffs and the commission.

The city and the commission moved to dismiss the action against them on the ground that the court lacked subject matter jurisdiction because the plaintiffs had failed to exhaust the contractual remedies set forth in the collective bargaining agreement.[8] Judge Freed

[8] Section 2.1 of the collective bargaining agreement provides in relevant part: "Any grievance or dispute which may arise between the parties concerning the application, meaning or interpretation of this Agreement, shall be settled in the following manner:

"Step 1. The aggrieved employee, who may be represented by an individual delegated by the Union Executive Board, if said employee so desires, shall take up the grievance or dispute with said employee's first level supervisor who is outside the bargaining unit within seven (7) working days of the date of the grievance or his knowledge of its occurrence. The first level supervisor outside the bargaining unit shall render his decision within seven (7) working days. Such supervisors shall exercise whatever authority may be delegated to them to resolve grievances, and in the event that no such authority is delegated, such supervisors shall have no jurisdiction in the grievance procedure.

"Step 2. If the grievance has not been settled, it shall be presented in writing, on forms provided by the City, to the Chief of Police by the employee and/or the individual delegated by the Union Executive Board within seven (7) working days after the supervisor's response is received. The written grievance shall include:

"(a) A statement of the grievance and facts involved.

"(b) The alleged violation of the specific provisions of this Agreement.

"(c) The remedy requested.

"The Chief of Police or his designated representative shall render his decision in writing within 14 working days of the date the grievance was submitted to him.

"Step 3. If the grievance has not been settled, it shall be presented in writing to the City Director of Personnel within 5 working days after the decision of the Chief of Police is received. If he so determines, the Director of Personnel, or his designated representative, shall meet with the interested parties no later than 10 working days after the receipt of the grievance and in any case shall render his decision in writing within 15 working days of the receipt of the grievance.

"Step 4. If the Union is not satisfied with the decision rendered in Step 3, it shall notify the Director of Personnel within 10 working days after receipt of the decision that it intends to submit the grievance to arbitration; and shall simultaneously file notice of appeal with the State Board of Mediation and Arbitration, which shall act on such request in accordance with its rules and procedures. Said Board shall be limited to the express terms of the contract and shall not have the power to modify, amend or delete any terms or provisions of the Agreement, or render a decision contrary to law.

agreed that the plaintiffs had not exhausted the contractual grievance procedures and, accordingly, granted the motion to dismiss. The plaintiffs reserved their right to appeal from that decision until after a final judgment had been rendered disposing of the entire case.

In March, 1991, after the present action had been dismissed as against the city and the commission, Labbe and Murdock filed another action against the city and the commission making substantially the same claims against them as they had in this action. In the complaint, however, they pleaded that they had made reasonable attempts to exhaust their contractual remedies, but that the union had wrongfully prevented them from filing a grievance and that they were, therefore, excused from exhausting the grievance procedures because to do so would have been futile. The trial court, *Hon. Robert J. Hale*, state trial referee, dismissed the action on the ground that Labbe and Murdock had failed to exhaust their contractual remedies. Labbe and Murdock appealed from this judgment dismissing their complaint. On appeal, we concluded that Murdock's case was moot because he had already become eligible for normal retirement. *Labbe* v. *Pension Commission*, 229 Conn. 801, 802 n.1, 643 A.2d 1268 (1994). We also determined, however, that the existence of the August agreement made it futile for Labbe to follow the grievance procedures, and we remanded his case for further proceedings. Id., 813.

Meanwhile, the present case proceeded to trial against the union on the sixth and seventh counts. See footnote 7. The jury found that the union had breached

"The decision of the arbitrator shall be final and binding on the parties.

"Nothing in this article is intended to prohibit the City from processing a grievance through the grievance procedure up to and including arbitration. Such grievance shall be submitted in writing to the Union President. If not satisfactorily resolved within 14 days, such grievance shall be submitted to arbitration. . . ."

its duty of fair representation to the plaintiffs, and awarded damages of $190,000 to Labbe, and $1 to each of the other four plaintiffs. The jury further found that the union had breached the contract formed by its bylaws, and awarded $1 in damages to each of the plaintiffs.

Thereafter, the union moved to set aside the verdict. Judge Aurigemma determined that the evidence was insufficient to establish that the union had either breached its duty of fair representation or violated its bylaws and, accordingly, granted the union's motion to set aside the verdict. All five plaintiffs appealed to the Appellate Court from both the judgment of Judge Freed dismissing the case against the city and the commission, and the judgment of Judge Aurigemma setting aside the verdict, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

I

THE APPEAL FROM THE JUDGMENT
OF DISMISSAL

A

All the plaintiffs have appealed from the judgment of Judge Freed dismissing the action with respect to the city and the commission. The commission and the city argue that, for a variety of reasons, this court lacks subject matter jurisdiction to decide the appeal with respect to each of the plaintiffs. We conclude that the appeal by Labbe, Murdock, Pleasent and Raphael is moot as against the city and the commission. We also conclude, however, that this court has subject matter jurisdiction to decide Rivera's appeal as against the city and the commission.

1

The city and the commission argue that all of the plaintiffs lack standing to enforce the collective bar-

gaining agreement because they are not parties to it. The city and the commission claim that any dispute as to the meaning, application or interpretation of the agreement is subject to the grievance procedure; see footnote 8; and that only the union may enforce the grievance procedure beyond the first three steps to the fourth step, namely, arbitration. Because we conclude in parts I A 2 and I A 3 of this opinion that, as against the city and the commission, the appeal of Labbe, Murdock, Pleasent and Raphael is moot, we need not decide whether those plaintiffs would otherwise have standing. We conclude, however, that Rivera has standing to maintain this action as against the city and the commission.

Ordinarily a court may entertain a suit by an individual employee to enforce the terms of a collective bargaining agreement only if the agreement so provides. *Paranko* v. *State*, 200 Conn. 51, 56, 509 A.2d 508 (1986). An employee does, however, have standing to enforce the terms of a collective bargaining agreement if the employee claims that the union has breached its duty of fair representation. *Vaca* v. *Sipes*, 386 U.S. 171, 186, 87 S. Ct. 903, 17 L. Ed. 2d 842 (1967). Because this case involves not only claims against the city and the commission for breach of the terms of the collective bargaining agreement, but also a claim against the union for breach of the duty of fair representation, we cannot conclude, at the outset, that Rivera lacks standing to proceed against the city and the commission.

2

The city and the commission also claim that, with respect to Labbe, this court lacks subject matter jurisdiction because his appeal is moot. They argue that, as a result of our decision in *Labbe*, he has already been granted a new trial on his claims against them. They

contend, therefore, that he cannot be afforded practical relief in this action. We agree.

The city and the commission correctly contend that, as a result of our decision in *Labbe*, he has already been granted a trial against them[9] and that, were he to prevail in this appeal, the result would be to remand the case for a trial against the city and the commission. Labbe, therefore, can gain nothing in this appeal that he does not already have by virtue of our decision in *Labbe*. Because " 'it is not the province of appellate courts to decide moot questions, disconnected from the granting of actual relief or from the determination of which no practical relief can follow' "; *Ayala* v. *Smith*, 236 Conn. 89, 93, 671 A.2d 345 (1996); Labbe's appeal against the city and the commission must be dismissed.

3

The city and the commission argue further that this appeal is moot with respect to Murdock, Pleasent and Raphael because each of them has become eligible for normal retirement without the use of military time. We agree.

"An actual controversy must exist not only at the time the appeal is taken, but also throughout the pendency of the appeal. . . . When, during the pendency of an appeal, events have occurred that preclude an appellate court from granting any practical relief through its disposition of the merits, a case has become moot." (Citation omitted; internal quotation marks omitted.) *Ayala* v. *Smith*, supra, 236 Conn. 93–94. In *Labbe* v. *Pension Commission*, supra, 229 Conn. 802 n.1, we observed that, although Murdock was still employed as a police officer at the commencement of that action, he became eligible for normal retirement on January 8, 1993, and his retirement date could no longer be affected by a

---

[9] That case is scheduled for a jury trial on July 31, 1996.

determination of whether military time could be used up front. Murdock's appeal, therefore, was moot.

The reasoning in *Labbe* applies with equal force in this case. Murdock became eligible for normal retirement in 1993, Pleasant became eligible in 1989, and Raphael became eligible in 1995. The issue of whether the city or the commission breached the collective bargaining agreement by determining that military time cannot be used up front can no longer affect them because it is no longer possible for them to use their military time up front. Their appeal, therefore, is moot.

4

The city and the commission also argue that Rivera's appeal as against them should be dismissed because it is not ripe. They argue that Rivera began working for the police department on August 16, 1985, and that, even if he were allowed to use his approximately two years of military time up front, he was not, at the time the complaint was filed, eligible to retire. Furthermore, they argue, he is not eligible to retire today. They contend, therefore, that his appeal is not ripe. We disagree.

We agree with the city and the commission that there is a question as to whether Rivera's claim was ripe at the time it was filed. But, "since ripeness is peculiarly a question of timing, it is the situation now rather than the situation at the time of the . . . decision [under review] that must govern." *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 140, 95 S. Ct. 335, 42 L. Ed. 2d 320 (1974). Just as we considered whether events occurring during the pendency of the appeal have rendered the appeal by Murdock, Pleasant and Raphael moot, we must consider whether the ripeness of Rivera's claim has changed during the pendency of this appeal.

Section 3.6 c 3 of the collective bargaining agreement provides that "[e]mployee pension benefits vest after

ten (10) years of continuous service"; see footnote 2; and § 3.6 c 4 provides that "[a]n employee who vests his or her pension and leaves the service of the City will be entitled to collect a pension benefit commencing on the date he or she would have reached his or her normal retirement date." See footnote 2. At the time this action was instituted, Rivera had worked for the city for only four years and was not, therefore, entitled to any pension benefits at all. Furthermore, if Rivera were to retire today, he would not be "eligible for retirement" now in the sense that he could not collect a pension immediately.

During the course of this appeal, however, Rivera's pension benefits have vested. He is, therefore, eligible for retirement now in the sense that were he to resign today, he would collect a pension beginning on his normal retirement date, in this case, either August 16, 2003, if military time may be used up front or, instead, August 16, 2005, if military time may not be used up front. A person engaged in planning for his or her financial future has a legitimate interest in knowing in advance when his or her pension will begin and how much it will be. Two years' worth of pension benefits may be a significant amount. Rivera, therefore, has a colorable claim that he has been harmed by the city's and the commission's determination that military time may not be used up front. We conclude that Rivera's claim is ripe for adjudication.

B

We turn, therefore, to the merits of Rivera's appeal from the judgment of Judge Freed dismissing his claim with respect to the city and the commission. Rivera argues that the city and the commission are collaterally estopped from contesting our conclusion in *Labbe* that Labbe was not required to exhaust his contractual reme-

dies and that, because the trial court's decision was predicated on a finding that Rivera had not exhausted his contractual remedies, the judgment of dismissal must be reversed. Rivera's argument is founded on an assertion that collateral estoppel applies because the issues and the parties in this appeal are identical to the issues and parties in *Labbe*. The city and the commission respond that Rivera's assertion is incorrect because he was not a party in *Labbe*. We agree. Furthermore, Rivera has not argued for the application of the nonmutuality doctrine of collateral estoppel.

Historically, the doctrine of collateral estoppel, or issue preclusion, required mutuality of the parties. The general rule of issue preclusion is that "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the *parties*, whether on the same or a different claim." (Emphasis added.) 1 Restatement (Second), Judgments § 27 (1982). Under the mutuality rule, "[p]arties who were not actually adverse to one another in a prior proceeding could not assert collateral estoppel against one another in a subsequent action." *Aetna Casualty & Surety Co.* v. *Jones*, 220 Conn. 285, 300, 596 A.2d 414 (1991).

The mutuality requirement has, however, been widely abandoned as an ironclad rule. See id. We have held that the "[mutuality] rule will no longer operate automatically to bar the use of collateral estoppel"; id., 303; but we also have recognized that circumstances may exist in which lack of mutuality would render application of collateral estoppel unfair. Id. This view is reflected in the Restatement (Second) of Judgments, which includes the mutuality rule within the general rule describing collateral estoppel; 1 Restatement (Sec-

ond), supra, § 27; but also includes a section that describes a rule of nonmutuality and sets forth a number of factors to be considered in determining whether to follow the nonmutuality rule. 1 Restatement (Second), supra, § 29.[10]

Contrary to his assertion, Rivera was not a party in *Labbe*. If he is to succeed in invoking collateral estoppel against the city and the commission, therefore, it can only be because the circumstances indicate that mutuality is not required. He has maintained throughout, however, that the parties in this appeal are identical to the parties in *Labbe*. Because Rivera has not addressed the

---

[10] Section 29 of the Restatement (Second) of Judgments (1982), provides: "Issue preclusion in subsequent litigation with others.

"A party precluded from litigating an issue with an opposing party, in accordance with §§ 27 and 28, is also precluded from doing so with another person unless the fact that he lacked full and fair opportunity to litigate the issue in the first action or other circumstances justify affording him an opportunity to relitigate the issue. The circumstances to which considerations should be given include those enumerated in § 28 and also whether:

"(1) Treating the issue as conclusively determined would be incompatible with an applicable scheme of administering the remedies in the actions involved;

"(2) The forum in the second action affords the party against whom preclusion is asserted procedural opportunities in the presentation and determination of the issue that were not available in the first action and could likely result in the issue being differently determined;

"(3) The person to invoke favorable preclusion, or to avoid unfavorable preclusion, could have effected joinder in the first action between himself and his present adversary;

"(4) The determination relied on as preclusive was itself inconsistent with another determination of the same issue;

"(5) The prior determination may have been affected by relationships among the parties to the first action that are not present in the subsequent action, or apparently was based on a compromise verdict or finding;

"(6) Treating the issue as conclusively determined may complicate determination of issues in the subsequent action or prejudice the interests of another party thereto;

"(7) The issue is one of law and treating it as conclusively determined would inappropriately foreclose opportunity for obtaining reconsideration of the legal rule upon which it was based;

"(8) Other compelling circumstances make it appropriate that the party be permitted to relitigate the issue."

issue of nonmutual collateral estoppel, even in response to the city's and the commission's argument that his collateral estoppel claim must fail on the ground of nonmutuality of the parties, we are unable to determine whether the considerations listed in § 29 of the Restatement (Second) of Judgments counsel in favor of, or against, the application of the nonmutuality rule in this case. Because one of the underpinnings of Rivera's collateral estoppel claim is mutuality of the parties, but Rivera manifestly does not fall within the parameters of the mutuality rule, we must conclude that, under the circumstances of this case, *Labbe* does not have preclusive effect against the city and the commission.

Apart from the collateral estoppel argument, Rivera offers no arguments in support of his appeal from the judgment of dismissal. Accordingly, we affirm that judgment.

## II

### THE APPEAL FROM THE JUDGMENT SETTING ASIDE THE VERDICT

We next address the plaintiffs' claim that Judge Aurigemma improperly set aside the verdict of the jury against the union. The plaintiffs contend that the trial court improperly concluded that they had adduced insufficient evidence that the union had violated the duty of fair representation in negotiating the August agreement and, thus, improperly substituted its judgment for that of the jury on factual issues.[11] Specifically,

---

[11] The plaintiffs also contend that the trial court improperly determined that they could not prevail against the union unless they proved that the city had breached the collective bargaining agreement and, therefore, improperly determined that the court had given incorrect jury instructions. In addition, the plaintiffs contend that the trial court improperly determined that they had failed to prove such a breach by the city when the court determined, as a matter of law, that the collective bargaining agreement unambiguously did not allow union members to use their military time up front. Because we agree with the trial court that the plaintiffs failed to present sufficient

they argue that the jury reasonably could have determined that: (1) Quigley and Grodecki acted in bad faith by negotiating the August agreement, which personally benefited themselves while stripping the plaintiffs of their rights under the collective bargaining agreement; or (2) Quigley and Grodecki acted arbitrarily in negotiating the August agreement; or (3) both. We disagree.

The following additional facts, which are derived from the evidence and reasonable inferences drawn therefrom and viewed in the light most favorable to sustaining the verdict in the plaintiffs' favor, are relevant to this issue. Quigley joined the Hartford police department in September, 1969, and had been a member of the department for eighteen years and eleven months at the time of the August agreement. Quigley was a Vietnam era veteran and had purchased two years and two months of his military service. Grodecki joined the Hartford police department in June, 1968, and had been a member of the department for over twenty years at the time of the August agreement. Grodecki was a Vietnam era veteran who had purchased two years of his military service. Prior to the August agreement, therefore, Quigley could have benefited from a rule allowing veterans to use their service time to retire early, but Grodecki could not have so benefited.

---

evidence that the union had breached its duty of fair representation, we do not reach these issues.

Although the plaintiffs, in their reply brief, allude to a claim that the trial court improperly set aside the verdict on the breach of the bylaws count of their complaint, they have raised no such claim in their initial brief. "We decline to consider this claim. It is a well established principle that arguments cannot be raised for the first time in a reply brief. . . . Although the function of the appellant's reply brief is to respond to the arguments and authority presented in the appellee's brief, that function does not include raising an entirely new claim of error." (Citations omitted; internal quotation marks omitted.) *Williams Ford, Inc.* v. *Hartford Courant Co.*, 232 Conn. 559, 593–94 n.26, 657 A.2d 212 (1995); *Commissioner* v. *Youth Challenge of Greater Hartford, Inc.*, 219 Conn. 657, 659 n.2, 594 A.2d 958 (1991).

At best, the collective bargaining agreement was ambiguous as to whether a union member could use his or her military time to retire early. The agreement was silent as to whether a union member could use his or her military time up front. See footnote 2. Its silence, in light of the past practice of allowing veterans of both world wars to use their military time to retire early; see footnote 3; created the possibility that this use of military time was, at minimum, not prohibited by the agreement and, at best, was permitted by the agreement.[12]

Despite the ambiguity in the collective bargaining agreement, Quigley, Grodecki and Dennis O'Brien, another union official, told various union members that they could use their purchased military time to retire early. At the meeting at which union officials explained the provisions of the agreement, prior to its ratification by the union membership in October, 1987, Quigley explained that the agreement would allow military time to be used up front. After ratification of the agreement, in late 1987, Quigley told Rivera that he could purchase his military time and use it to retire early. In late 1987

---

[12] In setting aside the verdict, the trial court determined, as a matter of law, that the collective bargaining agreement unambiguously did not allow union members to use their military time up front. The trial court made this determination based solely on the language of the agreement. Taking the evidence in the light most favorable to the plaintiffs, however, the failure of the agreement to state expressly that military time could not be used up front; see footnote 2; in combination with the past practice of allowing other war veterans to retire early, created ambiguity.

The plaintiffs argue that, *as a matter of law*, the collective bargaining agreement allowed them to use their military time up front. We disagree for three reasons. First, the agreement did not expressly give the plaintiffs that right, and there is minimal evidence in the agreement from which such a right could be implied. See footnote 2. Second, the past practice of allowing veterans to use their time to retire early had been limited to veterans of both world wars and the Korean conflict, and was based on statutes and municipal code provisions that are irrelevant to the current agreement. See footnote 3. Finally, there was no evidence that the negotiators had discussed and agreed on such a provision.

or early 1988, Grodecki told Pleasent several times that he could use his military time up front. Between May, 1988, and July, 1988, Quigley, Grodecki and O'Brien told Murdock that he would be able to use his military time to retire early. In July, 1988, Grodecki told Labbe that he could use his military time to retire early.

After the collective bargaining agreement was signed, and perhaps at the same time that they were representing to union members that military time could be used up front, Quigley and Grodecki participated in a series of negotiations with city officials regarding the rate at which purchased military time would be used to increase a retiree's pension benefits. Union officials never informed the union members that these discussions were taking place. In late July, 1988, city officials issued an opinion stating that military time could not be used up front under the agreement. At the final meeting, held on August 5, 1988, the city manager brought up the issue of whether military time could be used up front. As a result of these meetings, the union and the city agreed that: (1) those who purchased their military service would receive an additional 2.65 percent, rather than 2 percent, of their average annual salary for each year of purchased military service; and (2) no one could use his or her purchased military service time to retire early. See footnote 5. The union membership was never asked to ratify the August agreement. After the August agreement was reached, union officials informed the union membership of that agreement and consistently refused to help any union member to use his or her time up front.

The trial court's function in setting aside a verdict and this court's role in reviewing that action are well settled. "We have often held that [t]he decision to set aside the verdict entails the exercise of a broad legal discretion that, in the absence of clear abuse, we shall not disturb." (Internal quotation marks omitted.) *Ginsberg* v. *Fusaro*, 225 Conn. 420, 425, 623 A.2d 1014 (1993);

*Palomba* v. *Gray*, 208 Conn. 21, 24, 543 A.2d 1331 (1988); *O'Brien* v. *Seyer*, 183 Conn. 199, 208, 439 A.2d 292 (1981). In determining whether to set aside the verdict, the trial court walks a thin line. "The trial court should not set a verdict aside where there was some evidence upon which the jury could reasonably have based its verdict, but should not refuse to set it aside where the manifest injustice of the verdict is so plain and palpable as clearly to denote that some mistake was made by the jury in the application of legal principles, or as to justify the suspicion that [the jurors] or some of them were influenced by prejudice, corruption or partiality. . . . Within these parameters, furthermore, the trial court may set a verdict aside even if the evidence was conflicting and there was direct evidence in favor of the party who prevailed with the jury. . . . Ultimately, [t]he decision to set aside a verdict entails the exercise of a broad legal discretion . . . ." (Citations omitted; internal quotation marks omitted.) *American National Fire Ins. Co.* v. *Schuss*, 221 Conn. 768, 774, 607 A.2d 418 (1992); *Palomba* v. *Gray*, supra, 24–25; *Roma* v. *Thames River Specialties Co.*, 90 Conn. 18, 19–20, 96 A. 169 (1915).

"Limiting that discretion, however, is the litigants' constitutional right to have issues of fact determined by a jury where there is room for a reasonable difference of opinion among fair-minded jurors. . . ." (Internal quotation marks omitted.) *American National Fire Ins. Co.* v. *Schuss*, supra, 221 Conn. 774; *Palomba* v. *Gray*, supra, 208 Conn. 24–25; *Roma* v. *Thames River Specialties Co.*, supra, 90 Conn. 19–20. Because, "in setting aside the verdict, the trial court has deprived the party in whose favor the verdict was rendered of [the] constitutional right to have factual issues resolved by the jury, we must examine the evidential basis of the verdict itself to determine whether the trial court abused its discretion." *Palomba* v. *Gray*, supra, 23; *Jacobs* v.

*Goodspeed*, 180 Conn. 415, 417, 429 A.2d 915 (1980). In so doing, we "must consider the evidence, including reasonable inferences which may be drawn therefrom, in the light most favorable to the parties who were successful at trial . . . ." (Internal quotation marks omitted.) *Mulligan* v. *Rioux*, 229 Conn. 716, 726, 643 A.2d 1226 (1994), on remand, 38 Conn. App. 546, 662 A.2d 153 (1995); *Bleich* v. *Ortiz*, 196 Conn. 498, 501, 493 A.2d 236 (1985).

A union must represent its members in good faith. This duty of fair representation derives from the union's status as the sole bargaining representative for its members. As such, the union has the exclusive right and obligation to act for its members and to represent their interests. See General Statutes § 7-468 (d); *Tedesco* v. *Stamford*, 222 Conn. 233, 247–48, 610 A.2d 574 (1992); *Masto* v. *Board of Education*, 200 Conn. 482, 486–87, 511 A.2d 344 (1986); see also *Air Line Pilots* v. *O'Neill*, 499 U.S. 65, 74, 111 S. Ct. 1127, 113 L. Ed. 2d 51 (1991); *Vaca* v. *Sipes*, supra, 386 U.S. 177; *Steele* v. *Louisville & Nashville R. Co.*, 323 U.S. 192, 202–204, 65 S. Ct. 226, 89 L. Ed. 173 (1944).[13] Because the individual members are thereby deprived of the opportunity to represent themselves or to select a minority union, this duty of fair representation is a necessary " 'bulwark to prevent arbitrary union conduct . . . .' " *Breininger* v. *Sheet Metal Workers International Assn., Local Union No. 6*, 493 U.S. 67, 87, 110 S. Ct. 424, 107 L. Ed. 2d 388 (1989); *DelCostello* v. *International Brotherhood of Teamsters*,

---

[13] Because "[t]he Connecticut Municipal Employee Relations Act . . . is closely patterned after the National Labor Relations Act, as amended . . . [and] the language of these [acts] is essentially the [same, the] judicial interpretation frequently accorded the federal act is of great assistance and persuasive force in the interpretation of our own acts." *Winchester* v. *State Board of Labor Relations*, 175 Conn. 349, 354, 402 A.2d 332 (1978); accord *Hartford Principals' & Supervisors' Assn.* v. *Shedd*, 202 Conn. 492, 502, 522 A.2d 264 (1987); *Board of Education* v. *State Board of Labor Relations*, 190 Conn. 235, 241, 460 A.2d 1255 (1983).

462 U.S. 151, 164 n.14, 103 S. Ct. 2281, 76 L. Ed. 2d 476 (1983); *Vaca* v. *Sipes*, supra, 182.

The duty of fair representation requires the union "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion in complete good faith and honesty, and to avoid arbitrary conduct." *Vaca* v. *Sipes*, supra, 386 U.S. 177; see *Air Line Pilots* v. *O'Neill*, supra, 499 U.S. 74; *Chauffeurs, Teamsters & Helpers, Local No. 391* v. *Terry*, 494 U.S. 558, 563, 110 S. Ct. 1339, 108 L. Ed. 2d 519 (1990). A union breaches this duty if it acts arbitrarily, discriminatorily or in bad faith. See *Air Line Pilots* v. *O'Neill*, supra, 67; *Vaca* v. *Sipes*, supra, 190.

In reviewing the substantive decisions of a union, a court engages in a highly deferential review in light of the "wide latitude that negotiators need for the effective performance of their bargaining responsibilities." *Air Line Pilots* v. *O'Neill*, supra, 499 U.S. 78. A union does not violate its duty of fair representation if it, in good faith, "sacrifice[s] particular elements of the compensation package" to the detriment of some employees because the chosen elements would likely result in increased benefits for the employees in the bargaining unit as a whole. *Schneider Moving & Storage Co.* v. *Robbins*, 466 U.S. 364, 376, 104 S. Ct. 1844, 80 L. Ed. 2d 366 (1984); cf. *Barrentine* v. *Arkansas Best-Freight System, Inc.*, 450 U.S. 728, 742, 101 S. Ct. 1437, 67 L. Ed. 2d 641 (1981); *Humphrey* v. *Moore*, 375 U.S. 335, 349, 84 S. Ct. 363, 11 L. Ed. 2d 370 (1964); *Genovese* v. *Gallo Wine Merchants, Inc.*, 226 Conn. 475, 488, 628 A.2d 946 (1993). Indeed, because "[t]he whole process of collective bargaining is one of give and take [and] compromise . . . [i]f a union breached its duty of fair representation of unit members every time it made a concession, collective bargaining would be impossible." (Internal quotation marks omitted.) *Connecticut Education Assn.* v. *State Board of Labor Relations*, 5 Conn.

App. 253, 275, 498 A.2d 102, cert. denied, 197 Conn. 814, 815, 499 A.2d 804 (1985).[14]

In light of these principles, we conclude that a "union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness . . . as to be irrational." (Citation omitted; internal quotation marks omitted.) *Air Line Pilots* v. *O'Neill,* supra, 499 U.S. 67; see *Ford Motor Co.* v. *Huffman,* 345 U.S. 330, 338, 73 S. Ct. 681, 97 L. Ed. 1048 (1953). Furthermore, a union's actions are in bad faith if the union acts fraudulently or deceitfully; *Humphrey* v. *Moore,* supra, 375 U.S. 348–49; or does not act to further the best interests of its members.

Applying the proper standard of union liability to the facts of this case, we uphold the determination of the trial court to set aside the jury's verdict because we conclude that the evidence does not reasonably support a finding that the union breached its duty of fair representation by acting in bad faith or arbitrarily.[15] We first address the claim that the union acted in bad faith.

The August agreement clearly benefited a union representative who had negotiated that agreement, namely,

[14] The United States Supreme Court has recognized that "in securing the good of the entire bargaining unit, some differences in the treatment of individual union members might occur: 'Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion.' [*Ford Motor Co.* v. *Huffman,* 345 U.S. 330, 338, 73 S. Ct. 681, 97 L. Ed. 1048 (1953)]." *Metropolitan Edison Co.* v. *National Labor Relations Board,* 460 U.S. 693, 707, 103 S. Ct. 1467, 75 L. Ed. 2d 387 (1983).

[15] The plaintiffs have never contended that the union breached its duty by acting discriminatorily. We, therefore, do not address this issue.

Grodecki, to the detriment of some other members of the collective bargaining unit, including the plaintiffs. After the August agreement, Grodecki, as well as the plaintiffs and all other veterans, would be reimbursed at a rate of 2.65 percent for each year of military time purchased under the August agreement, instead of the 2 percent rate that the city claimed had been agreed upon in the collective bargaining agreement. Grodecki, however, had no personal interest in negotiating the ability to use the military time up front because he had already served twenty years for the city.[16] The fact that a negotiator may personally benefit from an agreement does not, however, constitute bad faith if the overall agreement increases the benefits for the membership as a whole and there is no other evidence of bad faith. Cf. *Humphrey* v. *Moore*, supra, 345 U.S. 349 ("we are not ready to find a breach . . . in taking a good faith position contrary to that of some individuals whom [the union] represents nor in supporting the position of one group of employees against that of another"); *Connecticut Education Assn.* v. *State Board of Labor Relations*, supra, 5 Conn. App. 275 ("conceivably some concessions might be so great and so improvident as to amount to a betrayal of a union's obligation"). The plaintiffs have not claimed that *only* Grodecki benefited from the August agreement; indeed, the plaintiffs conceded that Labbe and Murdock have benefited from that agreement, although not to the extent that either had hoped.

Although Grodecki and Quigley had assured the plaintiffs prior to the August agreement that they could use their military time up front, and Grodecki had advised at least one plaintiff to purchase military time in order to retire early, the plaintiffs have not proven bad faith. There is no evidence in the record that either Grodecki or Quigley acted fraudulently or intentionally to deceive

---

[16] Quigley had not yet served twenty years for the city.

the plaintiffs. The record reveals that Grodecki and Quigley had informed various union members initially that the collective bargaining agreement allowed them to use their military time up front. As the plaintiffs have consistently contended, this interpretation of the contract was reasonable. Because of the ambiguity in the collective bargaining agreement, however, this advice was unwise. An error in interpreting a contract, however, is not bad faith. Cf. *Humphrey* v. *Moore*, supra, 375 U.S. 348–49 (early assurances to union members were unfounded but consistent with information then available to union; changing opinion does not constitute dishonesty, deceit or fraud).

This conclusion is supported by the events following Labbe's initial attempt to retire. Once the city indicated to the union that the city did not agree that the collective bargaining agreement allowed the use of military time up front, Quigley and Grodecki acted to resolve the matter. Quigley and Grodecki had been negotiating with the city over another outstanding matter relating to military time—the proper rate at which such time increases the pension amount. Quigley and Grodecki were able to resolve both issues relating to the use of military time in a way that they could reasonably and in good faith have viewed as benefiting the entire bargaining unit. They agreed that the military time would increase pensions by the higher rate and that military time could not be used up front. As soon as the August agreement was reached, Quigley and Grodecki acted quickly to inform the entire union membership. Although it might well have constituted bad faith if Quigley and Grodecki had hidden the August agreement from the membership; cf. *Lewis* v. *Tuscan Dairy Farms, Inc.*, 25 F.3d 1138, 1143 (2d Cir. 1994) ("deliberately misrepresenting to employees a change in their rights guaranteed under the collective bargaining agreement" violates duty of fair representation); *Ben-*

*nett* v. *Local Union No. 66, Glass Workers International Union,* 958 F.2d 1429, 1435 (7th Cir. 1992) (same); they did not do so.

The plaintiffs contend that because Quigley and Grodecki negotiated the August agreement "secretly" and in violation of the union bylaws, they must have been acting in bad faith. Specifically, the plaintiffs contend that the August agreement did not merely clarify the collective bargaining agreement, but instead constituted a modification. As such, the plaintiffs contend, Quigley and Grodecki violated the bylaws by not involving all the proper union officials in the negotiations, not informing the membership of the negotiations, and never asking the membership to ratify the August agreement. Although, for the purposes of this opinion, even if we were to assume that the jury could reasonably have found from these facts that the union breached the bylaws,[17] we conclude that the plaintiffs did not adduce sufficient evidence to prove bad faith. As explained previously, the plaintiffs simply failed to provide evidence that Quigley or Grodecki acted intentionally or dishonestly to mislead the membership.

Finally, the plaintiffs contend that the union acted arbitrarily and, therefore, violated the duty of fair representation when it negotiated the August agreement. We disagree. In the August agreement, the union made a concession to the city to the disadvantage of one class of union members, namely, those who wished to apply their purchased military time to retire early, in order to gain a benefit for a greater class of union members, namely, all those who had purchased military time. Not only was this decision well within the "wide range of reasonableness" by which we judge a union's substan-

---

[17] A breach of the bylaws alone, unaccompanied by proof of malicious intent, hostility, discrimination, dishonesty or fraud is insufficient to prove bad faith. Cf. *Lewis* v. *Tuscan Dairy Farms, Inc.,* supra, 25 F.3d 1142–43.

tive decisions; see *Air Line Pilots* v. *O'Neill*, supra, 499 U.S. 78; but it exemplifies the essence of the collective bargaining process. See *Schneider Moving & Storage Co.* v. *Robbins*, supra, 466 U.S. 376; *Barrentine* v. *Arkansas Best-Freight System, Inc.*, supra, 450 U.S. 742; *Humphrey* v. *Moore*, supra, 375 U.S. 349; *Genovese* v. *Gallo Wine Merchants, Inc.*, supra, 226 Conn. 488. We conclude that the union did not violate the duty of fair representation by acting arbitrarily.

Our extensive review of the record persuades us that the plaintiffs did not produce sufficient evidence that the union had acted in bad faith or arbitrarily in violation of its duty of fair representation. We conclude that the trial court properly determined that the jury, as a matter of law, could not reasonably find that the union had violated this duty, and therefore, properly set aside the jury's verdict.

The judgment dismissing the case against the city and the commission is affirmed as to Rivera and the appeal from that judgment as to the remaining plaintiffs is dismissed; the judgment setting aside the verdict against the union is affirmed.

In this opinion the other justices concurred.