[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON MOTION TO SET ASIDE THE VERDICT
The defendants Greenhorne O'Mara, Inc., Tony Guerin, Jr. and James Barranger have moved to set aside the verdict rendered against them on May 20, 1998. Under that verdict the jury found that Greenhorne O'Mara had tortiously interefered with the business relationship between the plaintiff, Par Painting, Inc. and the Connecticut Department of Transportation and Shipsview Construction and awarded Par Painting damages in the amount of CT Page 12262 $664,000. The jury found that Greenhorne O'Mara's action constituted unfair or deceptive acts under the Connecticut Unfair Trade Practices Act, Connecticut General Statutes §§ 42-110b
et seq. ("CUTPA") and awarded $10,000 in damages and $5,000 in punitive damages against Greenhorne O'Mara for the CUTPA violation. The jury also found that James Barranger and Tony Guerin, Jr. each individually tortiously interefered with Par Painting's business relations and awarded the plaintiff $5,000 against each individual defendant.
The defendant, Greenhorne O'Mara, Inc, a corporation with its main office in Maryland, was hired by the Connecticut Department of Transportation ("DOT") to inspect the work of Par. The gravamen of Par's complaint is that Greenhorne O'Mara was overly and unreasonably particular in doing its job in that it required Par to redo work on the job and that delays attributable to Greenhorne O'Mara ultimately rendered it impossible for Par complete its work under a certain contract between Par and Shipsview Construction.
Facts
The following is a summary of the pertinent evidence at trial. Par Painting, Inc. ("Par") is a closely held corporation which is in the business of blasting old paint off of steel bridges and then repainting the bridges. Par's president, Peter Papadogiannis, has been in the business of sandblasting and painting bridges and other structures for thirty years. On April 20, 1994 Par entered into a contract with Shipsview Construction to sandblast and paint three bridges for a price of $1,085,000. The so-called Crooked Street Bridge in Plainville was the largest of the three bridges, at approximately 85,000 square feet, the second largest bridge had an area of 55,000 square feet and the smallest bridge was approximately 10,000 square feet in area. Under the terms of the contract Par was to commence work on the Crooked Street bridge in April, 1994 and was to complete all three bridges by September, 1994 (a period of 180 days). Mr. Papadogiannis estimated that it would require 150 days to complete all three bridges. There was evidence that cold weather would inhibit Par's ability to paint the bridges because the bridge paint did not properly adhere to the steel when the weather became too cold. Par did not start doing any work on the Crooked Street Bridge (or the other two bridges) until late July, 1994, approximately 90 days after it was supposed to have started the project.[1] Par did not actually start sandblasting the CT Page 12263 Crooked Street Bridge until late August, 1994.
The bridge painting industry changed dramatically in the mid to late 1980's due to the environmental and health problems which arose when lead based paint was blasted off of a bridge. In light of those problems, bridge painters, such as Par had to erect containment structures to insure that the lead-based paint which it blasted off of a bridge did not escape into the surrounding environment. Bridge painters also had to ensure that their employees were not exposed to high levels of lead.
The bridge painting industry had to address the environmental hazards associated with lead paint removal as well as devise an alterative to lead based paint which would adhere to the steel structures. The Steel Structures Painting Council ("SSPC") is a body which sets standards for the steel structures painting industry.
Par's contract with Shipsview was part of a larger contract between Shipsview and DOT. Under the terms of Par's contract with Shipsview, Par had to conform to the standards set by the SSPC. DOT hired Greenhorne O'Mara to inspect the work of Par to make sure that that work complied with SSPC standards. Defendants Tony Guerin, of Mississippi and James Barranger, of Florida, were employees of Greenhorne O'Mara.
The primary reason for Par's delay in its work on the three-bridge project was the fact that it started 90 days late, leaving itself only 90 days in which to complete a job that it had estimated would take 150 days to complete. Other causes for delay were: Par's initial failure to construct its lead paint containment structure in accordance with its own plans; the DOT's order to Par to cease work for seven days in October, 1994 because of a problem with Par's SSPC certification; Par's failure to have adequate employees on the job; and the presence of highly elevated blood lead levels found in some of Par employees, which prevented them from working on the bridge.
According to Mr. Papadogiannis, Par was prevented from finishing the three bridge project because Greenhorne O'Mara inspectors, including Guerin and Barranger, conducted inspections that were too lengthy, and unfairly criticized the work of Par. Mr. Papadogiannis testified that the defendants made Par employees repeat work unnecessarily and that caused delays in completing the Crooked Street Bridge. CT Page 12264
Mr. Papadogiannis began writing to Shipsview and the DOT complaining about Greenhorne O'Mara within days after Par had had its first sandblast rejected by Greenhorne O'Mara. The letters all stated that Par's blasts or Par's painting met SSPC specifications. However whenever the DOT inspected the work in question, it found that Greenhorne O'Mara was correct, and that Par's work did not meet the required specifications.[2]
Par was not ordered off the job by the DOT or Shipsview, but, instead, voluntarily stopped working on the Crooked Street Bridge in November 1994, having completed only 33% of the job.
Discussion of Law and Ruling
"`The trial court should not set a verdict aside where there was some evidence upon which the jury could reasonably have based its verdict, but should not refuse to set it aside where the manifest injustice of the verdict is so plain and palpable as clearly to denote that some mistake was made by the jury in the application of legal principles . . . Ultimately, [t]he decision to set aside a verdict entails the exercise of a broad legal discretion . . . Limiting that discretion, however, is the litigants' constitutional right to have issues of fact determined by a jury where there is room for a reasonable difference of opinion among fair-minded jurors . . . Because, in setting aside the verdict, the trial court has deprived the party in whose favor the verdict was rendered of [the] constitutional right to have factual issues resolved by the jury, we must examine the evidential basis of the verdict itself to determine whether the trial court abused its discretion . . . In so doing, we must consider the evidence, including reasonable inferences which may be drawn therefrom, in the light most favorable to the parties who were successful at trial . . . ' (Citations omitted; internal quotation marks omitted.) Labbe v. Pension Commission,239 Conn. 168, 191-93, 682 A.2d 490 (1996)." Purzycki v.Fairfield, 244 Conn. 101, 106, 107, 708 A.2d 937 (1998). "The jury's verdict must stand if they could reasonably and legally have reached their conclusion. Mezes v. Mead, supra,48 Conn. App. 328. The correctness of the trial court's denial of the motion to set aside the verdict or for judgment notwithstanding the verdict must be tested by viewing the evidence in the light most favorable to the sustaining the verdict. Bartone v. RobertL. Day Co., 232 Conn. 527, 536, 656 A.2d 221 (1995); Chanosky v.City Building Supply Co., 152 Conn. 642, 643, 211 A.2d 141
CT Page 12265 (1965)." Chieffalo v. Norden Systems, Inc., 49 Conn. App. 474,480, ___ A.2d ___ (1998).
In order to successfully to prosecute an action for tortious interference with business relations, a plaintiff must prove that the defendant's conduct was in fact tortious. This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously. Robert S. Weiss Associates, Inc. v.Wiederlight, 208 Conn. 525, 536, 546 A.2d 216 (1988); Blake v. Levy,191 Conn. 257, 260-261, 464 A.2d 52 (1983) 260-61; Kecko Piping Co.v. Monroe, 172 Conn. 197, 201-202, 374 A.2d 179
(1977). An action for intentional interference with business relations requires the plaintiff to plead and prove at least some improper motive or improper means. A claim is made out only when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself. Blake v. Levy,supra, 262; Kakadelis v. DeFabritis, 191 Conn. 276, 279-80,464 A.2d 57 (1983); see also Sportsmen's Boating Corporation v. Hensley,192 Conn. 747, 753, 755, 474 A.2d 780 (1984).
The plaintiff failed to prove its case with respect to liability or damages. The harm the plaintiff claimed to have sustained from Greenhorne O'Mara's tortious interference was delay, which it claimed was ultimately fatal to its ability to complete its project. However, most of the delays involved were caused by Par, and not Greenhorne O'Mara. Par made no attempt to explain how it could have completed a 150 day project in 90 days, or how the delays allegedly caused by Greenhorne O'Mara prevented Par from completing the job, while the delays of its own making did not. Moreover, Greenhorne O'Mara was being paid to interfere, in a sense, with Par's work. That is the nature of the job of an inspector. Each time an inspector requires a contractor to redo work, some interference has occurred. Obviously, such interference is not tortious.
Thus, in order to prove wrongful interference here the plaintiff would have to prove that the defendants virtuallyalways performed their jobs in bad faith, out of malice or improper motive. In other words, a good faith disagreement between Par and Greenhorne O'Mara as to whether Par's work met required standards, would not constitute tortious interference. If it did, then every job inspector would be exposed to a tort claim on every job he performed. CT Page 12266
The only evidence of malice presented by Par consisted of testimony by Mr. Papadogiannis that on one occasion, at which Mr. Papadogiannis was not present, some Greenhorne O'Mara employees laughed when Par's equipment became stuck in the mud. The only evidence of motive was that Greenhorne O'Mara was paid by the day, and not paid one contract price, like Par. According to Par, this gave Greenhorne O'Mara an incentive to delay Par's work, thereby making more money itself.
Not only was there very little evidence of malice or improper motive, there was uncontroverted evidence that some of the delays caused by Greenhorne O'Mara were legitimate, because Par's workwas inadequate. Peter Papadogiannis ultimately conceded at trial that Greenhorne O'Mara correctly criticized Par's containment structure and some of Par's blasting and painting. Mr. Papadogiannis admitted that Par had not initially constructed the containment structure in accordance with its own plans, and also admitted that on some occasions its work did not meet SSPC standards.
Where the performance of a defendant's job entails interference with the plaintiff and the plaintiff concedes that at least part of that job performance was proper, it becomes impossible for a trier to find that the interference "is wrongful by some measure beyond the fact of the interference itself."Blake v. Levy, supra, 262.
Even it the jury could have found that a portion of the delays resulted from the defendants' tortious interference, the plaintiff made no attempt to prove how the delay caused by thetortious conduct (as opposed to the nontortious, proper inspections) of the defendants prevented it from completing the three-bridge job. Given the many nonactionable delays which occurred on the project, it was impossible for the jury to find without resort to speculation or conjecture, that the defendants' tortious conduct, as opposed to its legitimate inspections or the plaintiff's own delays, caused the plaintiff's losses.
It is axiomatic that causation must be removed from the realm of speculation and conjecture. Doe v. Manheimer, 212 Conn. 748,765, 563 A.2d 699 (1989). A motion for a directed verdict is properly granted if the jury could not reasonably and legally have found that the plaintiff had proved the element of causation. Santopietro v. City of New Haven, 239 Conn. 207, 225, CT Page 12267682 A.2d 106 (1996).
The plaintiff also failed to prove any damages with reasonable certainty. "It is axiomatic that a claimant seeking damages bears the burden of proving, with reasonable certainty, those damages sustained as a result of his injury. Fox v. Mason,189 Conn. 484, 488, 456 A.2d 1196 (1983); Pacelli Bros.Transportation, Inc. v. Pacelli, 189 Conn. 401, 410, 456 A.2d 325
(1983); Johnson v. Flammia, 169 Conn. 491, 500, 363 A.2d 1048
(1975)." Conaway v. Prestia, 191 Conn. 484, 493-94, 464 A.2d 847
(1983). "The assessment of damages is peculiarly within the province of the trier and the award will be sustained so long as it does not shock the sense of justice. The test is whether the amount of damages awarded falls within the necessarily uncertain limits of fair and just damages." (Citations omitted; internal quotation marks omitted.) Buckman v. People Express, Inc.,205 Conn. 166, 174-75, 530 A.2d 596 (1987). Although damages often are "not susceptible of exact pecuniary computation and must be left largely to the sound judgment of the trier"; Johnson v.Flammia, supra; this situation does not invalidate a damage award as long as "the evidence afforded a basis for a reasonable estimate by the [trier] of that amount." Paiva v. Vanech HeightsConstruction Co., 159 Conn. 512, 517, 271 A.2d 69 (1970).
Mr. Papadogiannis testified that he had estimated that Par would have made a $350,000 profit if it had completed its contract with Shipsview. There was no evidence as to what costs and expenses had gone into this estimate, as to whether this estimate was made before or after Par started work 90 days late, or as to anything else which illuminated how the alleged lost profit had been calculated. However, Mr. Papadogiannis' conclusory statement as to Par's damages came into evidence without objection. Par received approximately $360,000 from Shipsview before it left the job.
Mr. Papadogiannis further testified that Par's real damage occurred in 1995 because its experience with Greenhorne O'Mara had rendered it virtually unable to obtain work in that year. According to Mr. Papadogiannis Par received only about $158,000 in contracts in 1995 and in total, Par had lost one million dollars because of the wrongdoing of Greenhorne O'Mara. The 1995 federal income tax return of Par (Defendants' Exhibit MMM) showed that, contrary to the testimony of Mr. Papadogiannis, Par did not have a mere $158,000 in receipts for 1995, it had $1,864,645 in receipts for that year. Moreover, the salary of the CT Page 12268 officers of Par, Mr. Papadogiannis and his wife, increased from $139,215 in 1994 to $300,000 in 1995. The plaintiff made no claim that the aforementioned tax return was inaccurate, and did not explain why the return showed Par's 1995 to be so vastly different from those claimed by Mr. Papadogiannis under oath.
The only evidence of damages other than the aforementioned testimony was Plaintiff's Exhibit 25, a copy of Par's checkbook for the period from June, 1994 through June, 1995. This document also came into evidence without objection. It contained some notations of expenses which appeared to be related to the contract with Shipsview. However, the plaintiff made no effort to identify which notations were attributable to that contract or, for that matter, which notations were claimed as evidence of damage arising from the defendants' wrongdoing. Exhibit 25 contained many entries which were clearly unrelated to the case. For example, it showed notations in amounts in excess of $150,000 for checks payable to "cash," amounts in excess of $70,000 for checks for various federal tax payments for periods prior to July, 1994, amounts in excess of $15,000 in payments for a 1994 Jeep Cherokee and 1993 Ford Explorer, and amounts in excess of $50,000 in payments for a "Danbury" job.
This court is fully aware that the litigants have a constitutional right to have issues of fact determined by a jury. However, in this case the "manifest injustice of the verdict is so plain and palpable as clearly to denote that some mistake was made by the jury in the application of legal principles". SeeLabbe v. Pension Commission, 239 Conn. 168, 191-93, 682 A.2d 490
(1996).
To reiterate the basis for this court's decision to set aside the verdict: there was insufficient evidence that the defendants' conduct was tortious, i.e. motivated by malice or other improper motive, rather than merely the performance of the defendants' duties as inspectors; there was insufficient evidence of a causal connection between any tortious conduct of the defendants and the plaintiff's losses; the plaintiff failed to prove damages with any reasonable certainty; and an undisputed piece of evidence (the plaintiff's 1995 federal income tax return) casts serious doubt on the testimony of Mr. Papadogiannis as to Par's damages. Based on the foregoing the verdicts as to Count One (tortious interference by Greenhorne O'Mara), Count Four (tortious interference by Tony Guerin, Jr.) and Count Five (tortious interference by James Barranger) are hereby ordered set aside. CT Page 12269
Since the unfair trade practice claimed against the defendants was their alleged wrongful interference with the plaintiff's work, the evidence as to the CUTPA count suffered from the same deficiencies as did the evidence as to tortious interference and the verdict on the CUTPA count, Count Three, is also ordered set aside.
By the court,
Aurigemma, J.