AMERICAN NATIONAL FIRE INSURANCE COMPANY
ET AL. *v.* JOHN SCHUSS ET AL.
(14369)

PETERS, C. J., SHEA, COVELLO, BORDEN and BERDON, Js.

Argued January 8—decision released April 28, 1992

---

*David C. Shaw,* for the appellant (named plaintiff).

*Lois Tanzer,* with whom, on the brief, was *Thomas O. Anderson,* for the appellee (defendant Barry Schuss).

BORDEN, J. The dispositive issue in this appeal is whether the plaintiff, American National Fire Insurance Company,[1] produced sufficient evidence for a jury to find that the defendant, Barry Schuss,[2] acted negligently, rather than intentionally, when he set fire to a synagogue in West Hartford in the early morning hours of August 11, 1983. The fire destroyed, among other things, the synagogue's Torah scrolls, which were located in the ark in the main sanctuary.

The plaintiff appeals[3] from the judgment of the trial court, rendered after a jury trial, setting aside the jury's

---

[1] Also named as a plaintiff was the synagogue, Young Israel of West Hartford, which was insured by American National Fire Insurance Company pursuant to a fire insurance policy. We refer herein to American National Fire Insurance Company as the plaintiff, since it brought suit as a subrogee of the rights of the synagogue under the policy.

[2] Also named as defendants were John and Anita Schuss, the parents of Barry Schuss. The case was withdrawn, however, against them. We refer herein, therefore, to Barry Schuss as the defendant.

[3] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023.

verdict in the plaintiff's favor in the amount of $167,877.07. Although the plaintiff has cast its claims on appeal in three parts;[4] our disposition of the first claim controls and subsumes the second and third claims. Because we agree with the trial court that there was no evidence from which the jury could reasonably have concluded that the defendant acted negligently, rather than intentionally, we affirm the judgment.

The plaintiff's revised complaint alleged that on August 11, 1983, the defendant "ignited combustible materials in multiple locations of the premises of Young Israel of West Hartford, thereby, causing a fire to occur at said premises." It further alleged that the fire and its resultant damages were caused by the negligence of the defendant "in that he, in one or more of the following ways: a. Ignited a fire, which he knew or should have known, could spread and damage or destroy the Young Israel building and its contents; b. Failed to take action to contain or extinguish the fire; c. Failed to alert or notify anyone of the existence of the fire and the necessity to extinguish it; and d. Failed to warn anyone that a fire had been ignited."

In support of these allegations, the jury had before it the following evidence, produced either by the plaintiff through exhibits and direct examination of its witnesses, or through the defendant's cross-examination

---

[4] The plaintiff claims that the trial court improperly set the verdict aside because: (1) there was sufficient evidence of the defendant's negligence to support the verdict; (2) there was sufficient evidence of causation to support the verdict; and (3) the court abused its discretion by imposing on the plaintiff the burden of proving the defendant's state of mind in a negligence case. Included in the third claim is an unelaborated argument that the court denied the plaintiff due process of law under article first, § 10 of the Connecticut constitution by denying the plaintiff access to the defendant's psychiatric records. We decline to consider this argument, however, because it is not adequately briefed. *State* v. *Tatum,* 219 Conn. 721, 742, 595 A.2d 322 (1991). A bare reference to the constitution is not sufficient to present such a claim.

of the plaintiff's witnesses including the defendant, who was called to the stand by the plaintiff. At 3:22 a.m. on August 11, 1983, the West Hartford fire department was notified of a fire at the synagogue, and arrived at the scene at 3:33 a.m. At that time, the synagogue was engulfed in a major fire that had been burning for one hour. It took approximately twenty minutes to bring the fire under control, and approximately two hours to extinguish it completely.

Officer Joseph Glowacki of the West Hartford police department, whose duties included investigation of suspicious fires, testified that the fire was "incendiary," meaning that "it was a fire that was not an act of God. It was a fire that was not accidental. It was a fire that was set by a person or persons." He determined that there were four points of origin of the fire inside the building, and that no accelerant, or flammable liquid, had been used. Matteo Pascarelli, a deputy fire chief, testified that there were three points of origin of the fire, and that when he arrived and entered the building the principal area of fire was "in the holy ark area" to the right of the front door. He also testified that all the fires had been set by a person. William Wilson, another deputy fire chief, testified that there were four points of origin: (1) in the basement, where paper towels had been burned on a table; (2) on the staircase leading from the basement to the first floor, "up against the wall under a telephone"; (3) in the front foyer of the building, where a telephone book and a prayer shawl had been ignited; and (4) in the sanctuary, where the damage was heaviest. He testified that, at that point of origin, the fire "progressed up the drapes" covering the ark and spread to the area "around the drapes such as the paneling [and] the doors . . . ." That caused heat to be driven to the ceiling, where the "heat amasse[d] at the highest point in the room" and then banked down, eventually causing a "flashover," which

occurs when the heat is so intense that material ignites spontaneously. Wilson also testified that it is easiest to fight a fire at its beginning, when the heat is less intense and when there is little damage, because the fire is on the point of origin. He testified further that it had taken five to ten minutes for the drapes to burn, and that damage to the contents of the synagogue had increased significantly when the flashover occurred, which he estimated happened between 3:12 and 3:17 a.m. Finally, he testified that the fire was incendiary, which he defined as "a deliberately set fire," and not an accidental fire or a fire caused by "an act of God such as lightning."

The defendant, who was seventeen years old at the time of the fire, came from a religious family. He lived in West Hartford with his parents, who were members of the synagogue. The plaintiff introduced into evidence the defendant's December 13, 1983 statement to the West Hartford police in which he admitted setting the fires. In that statement, the defendant stated that, on the morning of the fire, he had entered the building through a boarded up window, and had made telephone calls to Dallas, Texas.[5] He then began looking around and saw a book of paper matches. He stated further that, when he saw the matches, he had gotten "the idea to start a fire." He "took some paper towels from a window and put them into a plastic garbage can which was by the telephone," and put the pail near the front door. "At this time the papers in the pail were already burning," he stated. He put a prayer shawl and telephone book into the burning pail. He then left the building by the front door, and "then decided to return to the building and start another fire." He "entered the main room" and, "using the matches," he "lit one of the curtains . . . located over the [ark]." He stated

[5] Telephone records disclosed twenty-three such calls, placed between 1:57 and 2:42 a.m.

further that he "may have started another fire in the center of the room around a big wooden black [sic]." He "then went downstairs and tried to [light] a fire near the sink with some paper towels on a table." Then he went upstairs, left by the front door, and went home to bed.

The defendant testified that he had not gone to the synagogue with a plan to set fires. He testified that when he set fire to the curtains covering the ark, he had not intended to burn the Torah scrolls or the other contents of the building. He also testified that when he burned the curtains, he had not been thinking about whether he wanted to burn the Torah scrolls or the other contents of the building. He testified further, however, that he had intended to burn those items, including the curtains, to which he had set fire in the building. He also testified that he had left the building because the fire was out of control and he was in danger, and that he had not told anyone about the fire or called the authorities because he wanted the fire to continue and did not want to be caught.

After the jury returned its verdict in favor of the plaintiff, the defendant timely moved to set the verdict aside. The court granted the motion and rendered judgment for the defendant. This appeal followed.

The plaintiff claims that, although there was conflicting evidence, the jury could reasonably have determined from the following evidence that the defendant's conduct was negligent, rather than intentional. The defendant testified that he had not gone to the synagogue with the intent to start a fire. The plaintiff argues that the jury could have inferred from the defendant's testimony that he had intended to start "a few, small fires in relatively confined areas, such as in a garbage can, and near a sink while talking on the telephone," and that he had "set small fires in locations so as to

avoid damage to the contents of Young Israel Synagogue, and the holy Torah scrolls." The plaintiff argues further that the jury could have inferred from the defendant's testimony that he had started the fires while talking on the telephone, "that due care required that he report them," and that he did not do so because he "became afraid when the fires unexpectedly got out of control and presented a danger to him." We are unpersuaded.

The function of the trial court in setting a verdict aside, and the role of this court in reviewing that action, are well settled. "The trial court possesses inherent power to set aside a jury verdict which, in the court's opinion, is against the law or the evidence." *Palomba* v. *Gray*, 208 Conn. 21, 23–24, 543 A.2d 1331 (1988). The trial court should not set a verdict aside where there was some evidence upon which the jury could reasonably have based its verdict, but should not refuse to set it aside " 'where the manifest injustice of the verdict is so plain and palpable as clearly to denote that some mistake was made by the jury in the application of legal principles, or as to justify the suspicion that [the jurors] or some of them were influenced by prejudice, corruption or partiality.' " Id., 24. Within these parameters, furthermore, the trial court may set a verdict aside "even if the evidence was conflicting and there was direct evidence in favor of the party who prevailed with the jury." Id. Ultimately, "[t]he decision to set aside a verdict entails the exercise of a broad legal discretion . . . ." Id. Limiting that discretion, however, is the litigants' "constitutional right to have issues of fact determined by a jury" where " 'there is room for a reasonable difference of opinion among fairminded' " jurors. Id., 25.

This court's inquiry focuses on "the action of the trial court in setting aside the verdict." Id. We determine whether the trial court abused its broad discretion,

"according great weight to the action of the trial court and indulging every reasonable presumption in favor of its correctness"; id., 24; because the trial court, unlike this court, has had the opportunity "to view the witnesses," to gauge their credibility and the weight of their evidence, and to "detect those factors, if any, that could improperly have influenced the jury." Id. In doing so, "we must examine the evidential basis of the verdict itself to determine whether the trial court abused its discretion." Id. Applying this scope of review, we conclude that the trial court did not abuse its broad discretion in setting the verdict aside.

There is no real dispute in this appeal, nor was there any real dispute at the trial, about the course of the defendant's conduct in setting the fires. The only dispute is whether, in engaging in that course of conduct, he acted negligently or intentionally. If there was evidence upon which the jury could reasonably have found that he acted negligently, as the plaintiff argues, the plaintiff must prevail. If, however, the evidence was such that, as the defendant argues and as the trial court concluded, the only reasonable conclusion the jury could have reached is that he acted not negligently but intentionally, as those terms are properly understood in our tort jurisprudence, the defendant must prevail. Fundamental principles of tort liability lead us to conclude that, on the evidence produced here, the only reasonable conclusion for a fact finder to have reached is that the defendant acted intentionally.

It is axiomatic, in the tort lexicon, that intentional conduct and negligent conduct, although differing only by a matter of degree; *Mingachos* v. *CBS, Inc.,* 196 Conn. 91, 103, 491 A.2d 368 (1985); are separate and mutually exclusive. "The distinction between intentional and unintentional invasions draws a bright line of separation among shadings of almost infinitely varied human experiences." W. Prosser & W. Keeton,

Torts (5th Ed. 1984) p. 33. Although in a given case there may be doubt about whether one acted intentionally or negligently, the difference in meaning is clear. "As Holmes observed, even a dog knows the difference between being tripped over and being kicked." Id.

In its most common usage, "intent" involves "(1) . . . a *state of mind* (2) about *consequences* of an act (or omission) and not about the act itself, and (3) it extends not only to having in the mind a purpose (or desire) to bring about given consequences but also to having in mind a belief (or knowledge) that given consequences are substantially certain to result from the act." (Emphasis in original.) Id., p. 34. Also, the intentional state of mind must exist when the act occurs. Id. Thus, intentional conduct "extends not only to those consequences which are desired, but also to whose which the actor believes are substantially certain to follow from what the actor does." Id., p. 35. Furthermore, "[i]t is not essential that the precise injury which was done be the one intended." *Alteiri* v. *Colasso,* 168 Conn. 329, 334, 362 A.2d 798 (1975). "Rather, it is an intent to bring about a result which will invade the interests of another in a way that the law forbids." W. Prosser & W. Keeton, supra, p. 36. Our case law accords with these principles. See, e.g., *Mingachos* v. *CBS, Inc.,* supra; *Alteiri* v. *Colasso,* supra.

Negligent conduct, however, "is a matter of risk." W. Prosser & W. Keeton, supra, p. 169. It is defined as "conduct 'which falls below the standard established by law for the protection of others against unreasonable risk of harm.' " Id., quoting 2 Restatement (Second), Torts § 282. "Negligence is conduct, and not a state of mind." (Internal quotation marks omitted.) W. Prosser & W. Keeton, supra, p. 169. Prosser and Keeton aptly describe the relationship between intentional and negligent tortious conduct as follows: "In negligence, the actor does not desire to bring about the con-

sequences which follow, nor does he know that they are substantially certain to occur, or believe that they will. There is merely the risk of such consequences, sufficiently great to lead a reasonable person in his position to anticipate them, and to guard against them . . . . As the probability of injury to another, apparent from the facts within the acting party's knowledge, becomes greater, his conduct takes on more of the attributes of intent, until it approaches and finally becomes indistinguishable from that substantial certainty of harm that underlies intent." Id., pp. 169–70. Our case law also accords with these principles. See, e.g., *Polmatier* v. *Russ,* 206 Conn. 229, 537 A.2d 468 (1988); *Mingachos* v. *CBS, Inc.,* supra; *Alteiri* v. *Colasso,* supra; *Brown* v. *Branford,* 12 Conn. App. 106, 529 A.2d 743 (1987).

It is true, of course, that intentional tortious conduct will ordinarily also involve one aspect of negligent conduct, namely, that it falls below the objective standard established by law for the protection of others against unreasonable risk of harm. That does not mean, however, as the plaintiff's argument suggests, that the same conduct can reasonably be determined to have been both intentionally and negligently tortious. The distinguishing factor between the two is what the negligent actor does *not* have in mind: either the desire to bring about the consequences that follow or the substantial certainty that they will occur. If he acted without either that desire or that certainty, he was negligent; if he acted with either that desire or that certainty, he acted intentionally. Furthermore, if he acted with either that desire or certainty, a subsequent failure to warn his victim will not somehow transform his conduct from intentional to negligent conduct, because he is responsible for "the direct and natural consequence of the intended act." *Alteiri* v. *Colasso,* supra, 334, citing 1 Restatement (Second), Torts § 13.

Application of these principles to the evidence in this case compels the conclusion that the defendant acted intentionally, and not merely negligently. Certain facts bear repeating. In the middle of the night the defendant surreptitiously broke into the synagogue. Upon seeing a book of matches, he formed the idea to start a fire. He then started a fire in a plastic pail with paper towels, to which he added a telephone book and a prayer shawl, and left the burning pail near the front door. Although he then left the building, he returned, entered the sanctuary, and set fire to the curtains covering the ark. He then set at least one and probably two more fires in the building. All of these fires were incendiary, that is, deliberately set. He intended to burn all of the items, including the curtains in the sanctuary, that he set fire to in the building. Thereafter, he left the building because the fire was out of control and he was in danger. He did not report the fire because he did not want to get caught.

The only rational conclusion a fact finder could have reached is that the defendant acted either with the desire to cause harm by fire to the building or its contents, or with the substantial certainty that such harm would occur. The only rational conclusion is that the defendant intended, in the sense that we have discussed, to bring about a result, namely, some burning of that building or its contents, that invaded the interests of the synagogue in a way that the law forbids. W. Prosser & W. Keeton, supra, p. 36. "It is an abiding principle of jurisprudence that common sense does not take flight when one enters a courtroom." *State* v. *Zayas,* 195 Conn. 611, 620, 490 A.2d 68 (1985); *D'Arcy* v. *Shugrue,* 5 Conn. App. 12, 21, 496 A.2d 967, cert. denied, 197 Conn. 817, 500 A.2d 1336 (1985). It would defy common sense to think that the defendant neither desired nor knew with substantial certainty

that, when he set the fires, particularly the fire in the sanctuary, either the building or its contents or both would be damaged by fire.

It is of no moment that he may not have specifically intended the Torah scrolls to burn, or that he may not have specifically intended that the building be substantially damaged by fire. The degree of the intentional invasion of the synagogue's interest is not determinative. It is not necessary that the precise injury that occurred be the one intended, so long as the injury was the direct and natural consequence of the intended act. *Polmatier* v. *Russ,* supra, 240; *Alteiri* v. *Colasso,* supra, 334.

We are equally unpersuaded by the plaintiff's argument that the defendant, having set the fires, was negligent in not reporting them. It would be a curious rule of law, indeed, to convert an arsonist into a negligent actor by dint of his failure to report his arson to the fire department. Yet that is the substance of the plaintiff's argument. Intentional conduct does not become negligent conduct by virtue of the defendant's failure to take remedial steps to mitigate the injury. Rather, the defendant is responsible for the direct and natural consequences of his intended act. *Polmatier* v. *Russ,* supra, 240.

The judgment is affirmed.

In this opinion the other justices concurred.

