## STATE OF CONNECTICUT *v.* JAMES GRIFFIN
## (SC 16019)

McDonald, C. J., and Borden, Katz, Palmer and Sullivan, Js.

---

Argued January 13—officially released May 16, 2000

*Elizabeth M. Inkster*, assistant public defender, with whom, on the brief, was *Neal Cone*, assistant public defender, for the appellant (defendant).

*Mitchell S. Brody*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *David P. Gold*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

PALMER, J. After a jury trial, the defendant, James Griffin, was convicted of felony murder in violation of General Statutes § 53a-54c,[1] and aiding and abetting robbery in the first degree in violation of General Stat-

---

[1] General Statutes § 53a-54c provides in relevant part: "Felony murder. A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery . . . and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants . . . ."

utes §§ 53a-134 (a) (2)[2] and 53a-8.[3] The trial court rendered judgment[4] in accordance with the jury verdict, and the defendant appealed.[5] On appeal, the defendant claims that he is entitled to a new trial because: (1) the verdict was against the weight of the evidence; and (2) the trial court improperly instructed the jury on reasonable doubt. We reject both of these claims and, therefore, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In December, 1995, the defendant, who resided in an apartment located at 50 Button Street, New Haven, regularly purchased drugs from Ian Brown, a cocaine dealer known as "Ryder." The defendant generally contacted Ryder through Ryder's paging device when the defendant wished to purchase narcotics from him. Ryder usually delivered the drugs to a location across

---

[2] General Statutes § 53a-134 provides in relevant part: "(a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (2) is armed with a deadly weapon . . . ."

General Statutes § 53a-133, which defines robbery, provides: "A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny."

[3] General Statutes § 53a-8 provides in relevant part: "(a) A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender. . . ."

[4] The trial court sentenced the defendant to concurrent prison terms of forty-five years and twenty years on the felony murder and the robbery charges, respectively, for a total effective sentence of forty-five years.

[5] The defendant appealed from the judgment of the trial court to the Appellate Court and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

the street from the defendant's apartment. Although the defendant sometimes picked up the drugs from Ryder, he frequently sent someone else to do so.

On December 13, 1995, at approximately 6 p.m., Carlyle Herring, an acquaintance of the defendant, arrived at the defendant's apartment. Herring, who was then fifteen years old, had been to the defendant's apartment to use drugs on a few previous occasions. After engaging Herring in small talk, the defendant told him about a drug dealer named Ryder, whom Herring did not know. The defendant then suggested robbing Ryder of the drugs and cash that Ryder customarily carried. Specifically, the defendant proposed a plan whereby he would contact Ryder to set up a drug buy, and Herring, rather than the defendant, would meet with Ryder, ostensibly to pick up and pay for the drugs. Instead of purchasing the drugs from Ryder, however, Herring would rob Ryder of the drugs and any money that Ryder had in his possession. The defendant further explained that Ryder would be unable to identify Herring because Ryder and Herring did not know one another. After initially rejecting the defendant's suggestion, Herring agreed to the robbery plan.

The defendant then left the apartment and, upon returning, informed Herring that he had contacted Ryder, who had agreed to deliver the drugs to the usual location. The defendant gave Herring a .38 special revolver, and both Herring and the defendant walked across the street to await Ryder's arrival. Soon thereafter, the defendant saw Ryder's car approaching and pointed it out to Herring. As the car pulled up, the defendant hid so that Ryder could not see him.

Herring walked over to Ryder's car. Ryder was driving and Ira Lawrence, whom Herring also did not know, was sitting in the front passenger seat. Ryder asked Herring to identify himself. Herring stated that he was

"Coco's" little brother and that the defendant had sent him to pick up the "stuff." Ryder, who knew Coco, identified himself to Herring, and Herring got into the back seat of Ryder's car. After driving around the block, Ryder pulled over and parked a short distance from the defendant's apartment.

The three men remained in the car, and Ryder handed Herring a plastic package containing one ounce of cocaine. When Herring did not immediately pay for the cocaine,[6] Ryder told him to return the package and get out of the car. With the package in his possession, Herring exited the vehicle, removed the revolver from his coat pocket, put the revolver to Ryder's head and threatened to kill Ryder if he did not give Herring all of the money and drugs in his possession. Ryder complied, handing Herring two to three ounces of cocaine and several hundred dollars in cash. Herring then fired two shots, striking Ryder in the thigh and Lawrence in the chest.[7] Ryder drove to the hospital, where Lawrence died as a result of the gunshot wound to his chest. After the shooting, Herring gave the stolen drugs and money to the defendant.

I

The defendant first claims that he is entitled to a new trial on the ground that the verdict was against the weight of the evidence. The state contends that this claim is not reviewable because the defendant failed to seek such relief in the trial court. Alternatively, the state maintains that, even if the defendant's claim is reviewable, the verdict was not against the weight of the evidence. We conclude that the defendant's claim is not reviewable.

---

[6] Ryder, who testified at trial, expected to be paid $800 for the ounce of cocaine.

[7] Herring testified that he did not know why he had fired the revolver after Ryder had complied with his demand to turn over the drugs and money.

We first note that the defendant does not contend that the state's evidence, which consisted primarily of the accomplice testimony of Herring, was insufficient, as a matter of law, to establish the defendant's guilt beyond a reasonable doubt.[8] The defendant, therefore, does not seek a judgment of acquittal. Rather, he asserts that the state's case, which was predicated on Herring's testimony, was so flimsy as to raise a substantial question regarding the reliability of the verdict.[9] Thus, the defendant claims that he should be granted a new trial because of the serious danger that he was wrongly convicted.

"The trial court possesses inherent power to set aside a jury verdict which, in the court's opinion, is against the law or the evidence." *Palomba* v. *Gray*, 208 Conn. 21, 23–24, 543 A.2d 1331 (1988). That power, however, is subject to specific limitations. "The trial court should not set a verdict aside where there was some evidence upon which the jury could reasonably have based its verdict, but should not refuse to set it aside where the manifest injustice of the verdict is so plain and palpable as clearly to denote that some mistake was made by the jury in the application of legal principles, or as to

[8] The defendant moved for a judgment of acquittal at the close of the state's case and after the defendant had rested without presenting any evidence. On appeal, he does not challenge the trial court's denial of these motions.

[9] At the time of trial, Herring had pleaded guilty to felony murder, robbery and assault for his role in the robbery and shooting, and faced a maximum prison term of 100 years. The defendant claims that the state's case against him rested entirely on Herring's uncorroborated and self-serving testimony; the state maintains that Herring's testimony was supported by significant circumstantial indicia of reliability. Our review of the record indicates that, although Herring's testimony provided the sole *direct* evidence of the defendant's guilt, Herring's version of the events was buttressed by other evidence regarding the manner in which the robbery was conceived and carried out. We do not address this issue further, however, in light of our conclusion that the defendant's claim for a new trial, raised for the first time on appeal, is not reviewable.

justify the suspicion that [the jurors] or some of them were influenced by prejudice, corruption or partiality. . . . Within these parameters, furthermore, the trial court may set a verdict aside even if the evidence was conflicting and there was direct evidence in favor of the party who prevailed with the jury." (Citation omitted; internal quotation marks omitted.) *American National Fire Ins. Co.* v. *Schuss*, 221 Conn. 768, 774, 607 A.2d 418 (1992). The authority of the trial court to set aside a verdict that is against the weight of the evidence is grounded in the fact that "the action of a jury may be as unreasonable, and as suggestive of being produced by improper influences, in passing upon the credibility of witnesses and in the weighing of conflicting testimony, as in any other respect. It is one of the duties of a judge, in the due performance of his [or her] part in jury trials, to see to it that such influences, apparently operating upon the jury, do not prevail, and manifest injustice thereby be done." (Internal quotation marks omitted.) *State* v. *Avcollie*, 178 Conn. 450, 457, 423 A.2d 118 (1979), cert. denied, 444 U.S. 1015, 100 S. Ct. 667, 62 L. Ed. 2d 645 (1980), quoting *Roma* v. *Thames River Specialties Co.*, 90 Conn. 18, 20, 96 A. 169 (1915).

As we repeatedly have emphasized, the trial court is uniquely situated to entertain a motion to set aside a verdict as against the weight of the evidence because, unlike an appellate court, the "trial [court] has had the same opportunity as the jury to view the witnesses, to assess their credibility and to determine the weight that should be given to their evidence." *Palomba* v. *Gray*, supra, 208 Conn. 24–25; accord *Ginsberg* v. *Fusaro*, 225 Conn. 420, 431, 623 A.2d 1014 (1993); see also *American National Fire Ins. Co.* v. *Schuss*, supra, 221 Conn. 775. Indeed, we have observed that, "[i]n passing upon a motion to set aside a verdict, the trial judge must do just what every juror ought to do in arriving at a verdict." (Internal quotation marks omitted.) *State* v. *Hammond*,

221 Conn. 264, 267, 604 A.2d 793 (1992); accord *State* v. *Avcollie*, supra, 178 Conn. 456. "[T]he trial judge can gauge the tenor of the trial, as we, on the written record, cannot, and can detect those factors, if any, that could improperly have influenced the jury." *Palomba* v. *Gray*, supra, 25; accord *Ginsberg* v. *Fusaro*, supra, 431. Of necessity, therefore, an appellate court's inquiry must focus on whether the trial court abused its broad discretion in acting on a motion to set aside a verdict that allegedly is contrary to the weight of the evidence. See, e.g., *Wichers* v. *Hatch*, 252 Conn. 174, 189, 745 A.2d 789 (2000); *American National Fire Ins. Co.* v. *Schuss*, supra, 774–75; *Palomba* v. *Gray*, supra, 24.

It follows inexorably from the nature of the defendant's claim, namely, that the testimony of the state's key witness, Herring, was not believable, that the defendant's failure to raise such a claim in the trial court is fatal to his claim on appeal. On a cold record, we cannot meaningfully assess Herring's credibility to determine whether his testimony, which, if credited, concededly was sufficient to support the defendant's convictions, nevertheless was so unworthy of belief as to warrant a conclusion that allowing the verdict to stand would constitute a manifest injustice. See *Sweetman* v. *State Elections Enforcement Commission*, 249 Conn. 296, 334, 732 A.2d 144 (1999) ("[b]ecause we have nothing before us but a cold record, credibility determinations are not within our bailiwick"); *State* v. *Hodge*, 248 Conn. 207, 253–54, 726 A.2d 531, cert. denied, 528 U.S. 969, 120 S. Ct. 409, 145 L. Ed. 2d 319 (1999) ("appellate review of a cold record is no substitute for the ability of the trial court to witness firsthand a [witness'] responses and demeanor"). Only the trial judge was in a position to evaluate Herring's testimony, along with the other relevant evidence, to make such a determination. We, therefore, decline to review the defendant's claim.

## II

The defendant also contends that the trial court's jury instructions on reasonable doubt improperly diluted the state's burden of proof in violation of his rights under the fourteenth amendment to the federal constitution[10] and article first, §§ 8 and 9, of the Connecticut constitution.[11] Because the defendant raised no objection at trial to the court's charge on reasonable doubt,[12] he

---

[10] The fourteenth amendment to the United States constitution provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

[11] Article first, § 8, of the constitution of Connecticut provides in relevant part: "No person shall be . . . deprived of life, liberty or property without due process of law . . . ."

Article first, § 9, of the constitution of Connecticut provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

[12] The trial court charged the jury on reasonable doubt as follows: "In this case, as in all criminal prosecutions, the defendant is presumed to be innocent until proven guilty beyond a reasonable doubt. This presumption of innocence was with this defendant when he was first presented for trial in this case. It continues with him throughout this trial unless and until such time as all the evidence produced here in the orderly conduct of the case, considered in the light of these instructions of law, and deliberated upon by you in the jury room, satisfies you beyond a reasonable doubt that he is guilty.

"The burden to prove the defendant guilty of the crimes with which he is charged is upon the state. The defendant does not have to prove his innocence. This means that the state must prove beyond a reasonable doubt each and every element necessary to constitute the crime charged.

"Whether the burden of proof resting upon the state is sustained depends not on the number of witnesses nor on the quantity of the testimony but on the nature and quality of the testimony. Please bear in mind that one witness' testimony is sufficient to convict if it establishes all of the evidence of the crime beyond a reasonable doubt.

"The meaning of reasonable doubt can be arrived at by emphasizing the word reasonable. It is not a surmise, a guess or mere conjecture. Nor is it a doubt suggested by the ingenuity of a juror not warranted by the evidence. It is such a doubt, as in serious affairs that concern you, you would heed, that is, such a doubt as would cause reasonable men and women to hesitate to act in matters of importance. It is not hesitation springing from any feelings of pity or sympathy for the accused or any other person who might be affected by your decision. It is, in other words, a real doubt, an honest doubt, a doubt that has its foundation in the evidence or lack of evidence.

concedes that his claim is unpreserved. The defendant asserts, however, that he is entitled to a new trial because he has satisfied the requirements of *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989), in which we held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) Id., 239–40. Although we agree with the defendant that the record is adequate for our review of his claim, he cannot prevail because he has failed to establish a constitutional violation.[13]

---

It is a doubt that is honestly entertained and is reasonable in light of the evidence after a fair comparison and careful examination of the entire evidence.

"Proof beyond a reasonable doubt does not mean proof beyond all doubt. The law does not require absolute certainty on the part of the jury before it returns a verdict of guilty. The law requires that, after hearing all the evidence, if there is something in the evidence or lack of evidence that leaves in the minds of the jurors, as reasonable men and women, a reasonable doubt as to the guilt of the accused, then the accused must be given the benefit of that doubt and acquitted. Proof beyond a reasonable doubt is proof that precludes every reasonable hypothesis except guilt and is inconsistent with any other rational conclusion. If two conclusions can reasonably be drawn from the evidence, one of innocence and one of guilt, you must adopt the one of innocence."

We also note that, in its jury instructions on the elements of the crimes charged, the trial court repeatedly emphasized that the state bore the burden at all times to establish each of the elements of those crimes beyond a reasonable doubt.

[13] The defendant contends that the state constitution "require[s] a more stringent view of instructions intended to explain the concept of 'proof beyond a reasonable doubt' than the more forgiving federal jurisprudence . . . ." We need not resolve this claim, however, because, even if it is assumed, arguendo, that the state constitution "require[s] a more stringent

The defendant argues that four separate statements contained in the trial court's charge on reasonable doubt violated his federal and state constitutional rights to due process. Specifically, the defendant contends that the court improperly explained to the jury that reasonable doubt is: (1) "not a surmise, a guess or mere conjecture"; (2) "a real doubt, an honest doubt, a doubt that has its foundation in the evidence or lack of evidence"; and (3) "such a doubt, as in serious affairs that concern you, you would heed, that is, such a doubt as would cause reasonable men and women to hesitate to act in matters of importance." The defendant also challenges the language in the court's charge providing that, "[i]f two conclusions can reasonably be drawn from the evidence, one of innocence and one of guilt, you must adopt the one of innocence."

"It is fundamental that proof of guilt in a criminal case must be beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970) . . . . The [reasonable doubt concept] provides concrete substance for the presumption of innocence— that bedrock axiomatic and elementary principle whose enforcement lies at the foundation of the administration of our criminal law. . . . [Id.], 363. At the same time, by impressing upon the factfinder the need to reach a subjective state of near certitude of the guilt of the accused, the [reasonable doubt] standard symbolizes the significance that our society attaches to the criminal sanction and thus to liberty itself. *Jackson* v. *Virginia*, 443 U.S. 307, 315, 99 S. Ct. 2781, 61 L. Ed. 2d 560, reh. denied, 444 U.S. 890, 100 S. Ct. 195, 62 L. Ed. 2d 126 (1979). [Consequently] [t]he defendants in a criminal case are entitled to a clear and unequivocal charge by the court that the guilt of the defendants must be proved

view" of a trial court's instructions on reasonable doubt than the federal constitution, the defendant cannot prevail under that more stringent standard.

beyond a reasonable doubt." (Citations omitted; internal quotation marks omitted.) *State* v. *DelVecchio*, 191 Conn. 412, 419–20, 464 A.2d 813 (1983).

In determining whether a trial court's charge satisfies constitutional requirements, however, "individual jury instructions should not be judged in artificial isolation, but must be viewed in the context of the overall charge. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury." (Citations omitted; internal quotation marks omitted.) *State* v. *Diaz*, 237 Conn. 518, 536–37, 679 A.2d 902 (1996).

We previously have applied this standard of review in rejecting each of the claims advanced by the defendant, concluding that, in the context of the court's entire charge on reasonable doubt, the challenged language did not dilute the state's burden of proof. Thus, we have approved a reasonable doubt instruction containing the statement that such a doubt is not "a surmise, a guess or a conjecture"; (internal quotation marks omitted) *State* v. *Simms*, 201 Conn. 395, 420, 518 A.2d 35 (1986); see also *State* v. *Derrico*, 181 Conn. 151, 170, 171 & n.4, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980) ("not a surmise or a guess or a conjecture"); and an instruction explaining that a reasonable doubt is not a "surmise, or a guess, or a speculation . . . ." *State* v. *Butler*, 207 Conn. 619, 634, 543 A.2d 270 (1988); see also *State* v. *Small*, 242 Conn.

93, 114–15 & n.17, 700 A.2d 617 (1997) (rejecting constitutional challenge to charge containing explanation that reasonable doubt "is more than a guess or a surmise"). We also repeatedly have upheld the constitutionality of an instruction characterizing reasonable doubt as "a real doubt, an honest doubt, a doubt which has its foundation in the evidence or lack of evidence"; (internal quotation marks omitted) *State* v. *Taylor*, 239 Conn. 481, 504–505, 687 A.2d 489 (1996), cert. denied, 521 U.S. 1121, 117 S. Ct. 2515, 138 L. Ed. 2d 1017 (1997); see also *State* v. *Hines*, 243 Conn. 796, 816–20, 709 A.2d 522 (1998). Furthermore, both the United States Supreme Court; see *Victor* v. *Nebraska*, 511 U.S. 1, 18, 21, 114 S. Ct. 1239, 127 L. Ed. 2d 583 (1994); and this court; see *State* v. *Morant*, 242 Conn. 666, 688, 701 A.2d 1 (1997); *State* v. *Smith*, 210 Conn. 132, 147–50, 554 A.2d 713 (1989); have reached the same conclusion with respect to an explanation that reasonable doubt is a doubt that would cause a reasonably prudent person to "hesitate" to act in matters of importance.[14] The

[14] We note, however, that the "hesitate to act" instruction has been criticized as unhelpful "because the analogy it uses seems misplaced. In the decisions people make in the most important of their own affairs, resolution of conflicts about past events does not usually play a major role. Indeed, decisions we make in the most important affairs of our lives—choosing a spouse, a job, a place to live, and the like—generally involve a very heavy element of uncertainty and risk-taking. They are wholly unlike the decisions jurors ought to make in criminal cases." (Internal quotation marks omitted.) *Victor* v. *Nebraska*, supra, 511 U.S. 24 (Ginsburg, J., concurring in part), quoting Federal Judicial Center, Pattern Criminal Jury Instructions (1987) pp. 28–29, commentary on Instruction No. 21. Moreover, Judge Jon O. Newman, of the United States Court of Appeals for the Second Circuit, has stated: "Although, as a district judge, I dutifully repeated [the 'hesitate to act' language] to juries in scores of criminal trials, I was always bemused by its ambiguity. If the jurors encounter a doubt that would cause them to 'hesitate to act in a matter of importance,' what are they to do then? Should they decline to convict because they have reached a point of hesitation, or should they simply hesitate, then ask themselves whether, in their own private matters, they would resolve the doubt in favor of action, and, if so, continue on to convict?" J. Newman, "Beyond 'Reasonable Doubt,'" 68 N.Y.U. L. Rev. 979, 982–83 (1993); see also note, "Reasonable Doubt: An Argument Against Definition," 108 Harv. L. Rev. 1955, 1968–69 (1995) ("the

defendant has provided no persuasive reason why these challenged instructions, when viewed in the context of an otherwise accurate and thorough charge on reasonable doubt, diminish the state's burden of proof.

We also have rejected challenges to an instruction providing that, if two conclusions reasonably can be drawn from the evidence, one of guilt and one of innocence, the jury must adopt the conclusion of innocence. E.g., *State* v. *Smith*, 219 Conn. 160, 166–67, 592 A.2d 382 (1991); *State* v. *Dyson*, 217 Conn. 498, 503–504, 586 A.2d 610 (1991). We previously have approved this so-called "two-inference" instruction in light of the fact that it did not "diminish the state's burden where [t]he charge as a whole correctly instructed the jury as to the state's burden of proof." (Internal quotation marks omitted.) *State* v. *Smith*, supra, 166, quoting *State* v. *Dyson*, supra, 504. In upholding the use of the language, we recognized that the United States Court of Appeals for the Second Circuit, at the time of our decision in *Dyson*, recently had prohibited the use of such an instruction because the "instruction by implication suggests that a preponderance of the evidence standard is relevant, when it is not. Moreover, the instruction does not go far enough. It instructs the jury on how to decide when the evidence of guilt or innocence is evenly balanced, but says nothing on how to decide when the inference of guilt is stronger than the inference of innocence but not strong enough to be beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Dyson*, supra, 504, quoting *United States* v. *Khan*, 821 F.2d 90, 93 (2d Cir. 1987); see also *State* v. *Gant*, 231 Conn. 43, 49, 646 A.2d 835, cert. denied, 514 U.S. 1038,

commonly used 'hesitate to act' definition, which defines a reasonable doubt as 'the kind of doubt that would make a reasonable person hesitate to act in the most important of his own affairs,' has drawn widespread criticism for trivializing a criminal verdict by analogizing it to decisions jurors make in their personal lives").

115 S. Ct. 1404, 131 L. Ed. 2d 291 (1995) (recognizing possible danger of two-inference instruction).

We see no reason to depart from our prior determination that the two-inference charge, when viewed in the context of an otherwise proper instruction on reasonable doubt, does not impermissibly dilute the state's burden of proof. Consequently, the defendant cannot prevail on his final claim of constitutional impropriety. Nevertheless, we now are persuaded, for the reasons articulated by the Second Circuit, that "standing alone, such language may mislead a jury into thinking that the [state's] burden is somehow less than proof beyond a reasonable doubt."[15] *United States* v. *Attanasio*, 870 F.2d 809, 818 (2d Cir. 1989); accord *United States* v. *Khan*, supra, 821 F.2d 93. We, therefore, invoke our supervisory authority over the administration of justice[16] to direct

[15] We wish to underscore the fact that, "[a]lthough [the reasonable doubt] standard is an ancient and honored aspect of our criminal justice system, it defies easy explication." *Victor* v. *Nebraska*, supra, 511 U.S. 5. Indeed, "[w]e have recognized that [a]ttempts to explain the term reasonable doubt do not usually result in making it any clearer to the minds of the jury. . . . We have further noted that [j]udicial attempts to clarify the meaning of the phrase reasonable doubt by explanation, elaboration or illustration . . . more often than not tend to confuse or mislead." (Internal quotation marks omitted.) *State* v. *Faust*, 237 Conn. 454, 476, 678 A.2d 910 (1996); accord *State* v. *Webb*, 238 Conn. 389, 457, 680 A.2d 147 (1996); *State* v. *Figueroa*, 235 Conn. 145, 184, 665 A.2d 63 (1995); *State* v. *Marra*, 222 Conn. 506, 536, 610 A.2d 1113 (1992); *State* v. *Butler*, supra, 207 Conn. 636; *State* v. *DelVecchio*, supra, 191 Conn. 420. Thus, "we have repeatedly stated that attempts to clarify reasonable doubt should be avoided because they often tend to obfuscate that concept." *State* v. *Faust*, supra, 476.

[16] "Appellate courts possess an inherent supervisory authority over the administration of justice. . . . The standards that [are] set under this supervisory authority are not satisfied by observance of those minimal historic safeguards for securing trial by reason which are summarized as due process of law . . . . Rather, the standards are flexible and are to be determined in the interests of justice. . . . [O]ur supervisory authority is not a form of free-floating justice, untethered to legal principle. . . . Rather, the integrity of the judicial system serves as a unifying principle behind the seemingly disparate use of our supervisory powers." (Internal quotation marks omitted.) *State* v. *Schiappa*, 248 Conn. 132, 175–76 n.47, 728 A.2d 466, cert. denied, 528 U.S. 862, 120 S. Ct. 152, 145 L. Ed. 2d 129 (1999).

that, in the future,[17] our trial courts refrain from using the "two-inference" language so as to avoid any such possible misunderstanding.[18]

The judgment is affirmed.

In this opinion the other justices concurred.

---

[17] We note that we previously have invoked our supervisory authority to prohibit the use of certain instructional language, even though we previously had approved the use of such language, because the challenged portion of the instruction, when considered in isolation, gave rise to a danger of juror confusion or misunderstanding. See *State* v. *Delvalle*, 250 Conn. 466, 473–76, 736 A.2d 125 (1999) (prohibiting future use of charge that reasonable doubt is not "a doubt suggested by the ingenuity of counsel" [internal quotation marks omitted]); *State* v. *Schiappa*, 248 Conn. 132, 168, 175, 728 A.2d 466, cert. denied, 528 U.S. 862, 120 S. Ct. 152, 145 L. Ed. 2d 129 (1999) (prohibiting future use of charge that requirement of proof beyond reasonable doubt is "a rule of law . . . made to protect the innocent and not the guilty" [internal quotation marks omitted]).

[18] The following is a permissible alternative to the two-inference charge: "If you can, in reason, reconcile all of the facts proved with any reasonable theory consistent with the innocence of the accused, then you cannot find him guilty." 5 D. Borden & L. Orland, Connecticut Practice: Criminal Jury Instructions (Sup. 1999) § 2.9, pp. 2–3. This language, if utilized, logically would follow the instruction given by the trial court in this case that "[p]roof beyond a reasonable doubt is proof that precludes every reasonable hypothesis except guilt and is inconsistent with any other rational conclusion." Footnote 12 of this opinion; see also 5 D. Borden & L. Orland, supra, § 2.9, p. 2.