******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ZARELLA, J., concurring in part and dissenting in part. In the present case, the majority correctly determines that the trial court did not violate the constitutional rights of the respondent, Ashley P., when it allowed her to forgo a trial without canvassing her to ensure that she understood the rights that she forfeited in doing so. Nevertheless, the majority invokes this court's supervisory authority in order to reverse the judgments of the trial court. In my view, this use of the court's supervisory authority is entirely unwarranted. Moreover, I write separately to emphasize that this court *never* should exercise its supervisory authority to reverse a judgment in the absence of independent grounds for reversal. Although I recognize that this court previously has exercised its supervisory authority in this manner, and that I have joined in some of those decisions; see, e.g., *State* v. *Connor*, 292 Conn. 483, 505–506, 973 A.2d 627 (2009); I no longer believe that it should. Procedural rules announced under the court's supervisory authority should be given only prospective effect and not be used to reverse judgments in individual cases. Accordingly, I respectfully dissent in part.

I begin by briefly outlining the principles that previously have guided this court in its use of supervisory authority. "It is well settled that [a]ppellate courts possess an inherent supervisory authority over the administration of justice. . . . Supervisory powers are exercised to direct trial courts to adopt judicial procedures that will address matters that are of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . Under our supervisory authority, we have adopted rules intended to guide the lower courts in the administration of justice in all aspects of the criminal process . . . and on the civil side, as well. Thus, this court has exercised its supervisory authority over a wide variety of matters . . . . We ordinarily invoke our supervisory powers to enunciate a rule that is not constitutionally required but that we think is preferable as a matter of policy." (Citations omitted; internal quotation marks omitted.) *Kervick* v. *Silver Hill Hospital*, 309 Conn. 688, 710, 72 A.3d 1044 (2013).

"Supervisory authority is an extraordinary remedy that should be used sparingly . . . . Although [a]ppellate courts possess an inherent supervisory authority over the administration of justice . . . [that] authority . . . is not a form of free-floating justice, untethered to legal principle. . . . Our supervisory powers are not a last bastion of hope for every untenable appeal. [Rather] [t]hey are an *extraordinary* remedy . . . . Constitutional, statutory and procedural limitations are generally adequate to protect the rights of the defendant

and the integrity of the judicial system. Our supervisory powers are invoked only in the rare circumstance [in which] these traditional protections are inadequate to ensure the fair and just administration of the courts. . . . Overall, the integrity of the judicial system serves as a unifying principle behind the seemingly disparate use of our supervisory powers. . . . Thus, we are more likely to invoke our supervisory powers when there is a pervasive and significant problem . . . or when the conduct or violation at issue is offensive to the sound administration of justice . . . ." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Edwards*, 314 Conn. 465, 498–99, 102 A.3d 52 (2014).

"[W]e recently [have] explained that the cases in which this court has invoked its supervisory authority can be divided into two different categories. In the first category are cases [in which] we have utilized our supervisory power[s] to articulate a procedural rule as a matter of policy, either as holding or dictum, but without reversing [judgments] or portions thereof. In the second category are cases [in which] we have utilized our supervisory powers to articulate a rule or otherwise take measures necessary to remedy a perceived injustice with respect to a preserved or unpreserved claim on appeal. Although we recently have noted that [o]ur cases have not always been clear as to the reason for this distinction . . . a review of the cases in both categories demonstrates that, in contrast to the second category, the first category consists of cases [in which] there was no perceived or actual injustice apparent on the record, but the facts of the case lent themselves to the articulation of prophylactic procedural rules that might well avert such problems in the future." (Citation omitted; internal quotation marks omitted.) *State* v. *Carrion*, 313 Conn. 823, 850, 100 A.3d 361 (2014); see also *State* v. *Elson*, 311 Conn. 726, 768–70 n.30, 91 A.3d 862 (2014) (listing cases in both categories).

In my view, it is the second category of cases, in which we have used our supervisory authority to reverse judgments, that is problematic. The fundamental problem with this practice is that it undermines the rule of law. To understand how, we must examine more closely how we have used our supervisory authority to reverse judgments in individual cases.

The question of whether we should use our supervisory authority to reverse judgments in individual cases is really a question of whether we should retroactively apply the new rules we announce under our supervisory authority to the facts of the cases in which they are announced. In the past, we have not been consistent in how we have applied such new rules. In some cases, we have announced rules under the court's supervisory authority only prospectively. See, e.g., *State* v. *Medrano*,

308 Conn. 604, 631, 65 A.3d 503 (2013) (directing trial courts to refrain from giving certain jury instruction and upholding judgment even though trial court had given such instruction); *State* v. *Ouellette*, 295 Conn. 173, 191–92, 989 A.2d 1048 (2010) (directing trial courts to inquire into nature of plea agreements and upholding judgment even though trial court had failed to so inquire); *State* v. *Griffin*, 253 Conn. 195, 209–10, 749 A.2d 1192 (2000) (directing trial courts to refrain from using certain instructional language and affirming judgment even though trial court had used such language). Yet, in other cases, we have applied such rules retroactively to the facts of the case in which the rule is announced. In those cases, we sometimes have affirmed the judgment of the trial court on the ground that the court had unknowingly complied with the new rule; see, e.g., *State* v. *Coleman*, 242 Conn. 523, 534–35, 700 A.2d 14 (1997) (requiring trial courts to articulate reasons for imposing longer sentence after trial than state and defendant previously had agreed on pursuant to vacated guilty plea and upholding defendant's sentence because trial court sufficiently had articulated such reasons); and sometimes have reversed the judgment on the ground that the trial court had failed to comply with the new rule, even though the rule was not in effect at the time of trial. See, e.g., *State* v. *Elson*, supra, 311 Conn. 764, 784–85 (cautioning trial courts against commenting negatively on, at sentencing, defendant's decision to exercise his right to trial and remanding case for new sentencing because trial court had done so); *State* v. *Rose*, 305 Conn. 594, 605–606, 46 A.3d 146 (2012) (adopting per se rule of reversibility when defendant is compelled to stand trial in identifiable prison clothing and upholding Appellate Court's reversal of trial court's judgment because defendant had stood trial in such clothing); *State* v. *Santiago*, 245 Conn. 301, 332, 340, 715 A.2d 1 (1998) (requiring trial courts to conduct more extensive inquiry in order to investigate allegations of racial or ethnic bias on part of juror and reversing judgment because trial court had failed to conduct such inquiry).[1] Thus, there has been no rhyme or reason as to when the court has applied a new rule prospectively or retroactively.

Scholars suggest that the decision to apply a new rule retroactively in the context of an individual case involves countervailing interests. See L. Fuller, The Morality of Law (1964) p. 57; see also J. Fisch, "Retroactivity and Legal Change: An Equilibrium Approach," 110 Harv. L. Rev. 1055, 1084–87 (1997). On the one hand, retroactively applying a new rule destroys the parties' reliance interests by subjecting them to a rule of which they had no prior notice. See, e.g., *Kaiser Aluminum & Chemical Corp.* v. *Bonjorno*, 494 U.S. 827, 855, 110 S. Ct. 1570, 108 L. Ed. 2d 842 (1990) (Scalia, J., concurring) ("[t]he principle that the legal effect of conduct should ordinarily be assessed under the law that existed when

the conduct took place has timeless and universal human appeal"); see also L. Fuller, supra, p. 57 ("[i]f [the] overruling is made retrospective, then the [party relying on the decision being overruled] loses out though he relied on a legal decision that was clearly in his favor"). On the other hand, if the new rule is not applied retroactively, and the party who sought the new rule does not receive the benefit of its effect, that party's incentive to suggest the promulgation of a new rule to enhance the administration of the judicial system is undermined. See L. Fuller, supra, p. 57; J. Fisch, supra, 1085–86. This concern, it seems to me, pales in comparison to the fairness and due process concerns that are raised when a party is subjected to a rule of which it had no prior notice. Nevertheless, the impact of imposing retroactive rules also should be examined from the perspective of not only individual cases, but the judicial system as a whole.

When viewed from the perspective of the entire judicial system, it is clear to me that we should not give retroactive effect to new rules announced under our supervisory authority because doing so subverts the rule of law. At its essence, the rule of law "conveys an ideal of governmental power and discretion being exercised and constrained within a framework of rules." J. Waldron, "Stare Decisis and the Rule of Law: A Layered Approach," 111 Mich. L. Rev. 1, 2 (2012). "The rule of law requires people in positions of authority to exercise their power under the authority, and within a constraining framework, of public norms (laws) rather than on the basis of their own preferences or ideology . . . ." Id., 3; cf. R. Kozel, "Precedent and Reliance," 62 Emory L.J. 1459, 1464 (2013) (rule of law ensures that "bedrock principles are founded in the law rather than in the proclivities of individuals" [internal quotation marks omitted]). The judiciary's adherence to the rule of law is a defining characteristic of any healthy democracy, as it provides individuals with "clarity, certainty, predictability, [and] trustworthiness" as to the rules that govern their lives. J. Finnis, Natural Law and Natural Rights (1980) p. 272.

We undermine the rule of law when we promulgate a new rule under the court's supervisory authority and then reverse a trial court's judgment on the ground that the trial court had failed to comply with that new rule, which did not exist at the time of trial. As I previously discussed, this court has observed that "the integrity of the judicial system serves as a unifying principle" to guide our use of supervisory authority; (internal quotation marks omitted) *State* v. *Edwards*, supra, 314 Conn. 498; and that we use our supervisory authority to reverse a judgment only when it "is necessary to ensure that justice is achieved in [a] particular case." *State* v. *Carrion*, supra, 313 Conn. 852. When, however, the only principles constraining our use of supervisory authority are concepts such as "integrity" and "justice," we are

not really constrained at all. See *Kaiser Aluminum & Chemical Corp.* v. *Bonjorno*, supra, 494 U.S. 857 (Scalia, J., concurring) ("Manifest injustice, I fear, is just a surrogate for policy preferences. . . . [When discussing the standard of manifest injustice] one is not really talking about justice at all, but about mercy, or compassion, or social utility, or whatever other policy motivation might make one favor a particular result." [Internal quotation marks omitted.]). Indeed, we openly acknowledge the fact that the rules that we craft pursuant to the court's supervisory authority are simply rules that "we think [are] preferable as a matter of policy." (Internal quotation marks omitted.) *Kervick* v. *Silver Hill Hospital*, supra, 309 Conn. 710. Thus, when we retroactively apply such rules to reverse judgments, we decide cases not on the basis of controlling legal principles, but on the court's policy preferences.

Constantly exercising the court's supervisory authority in this manner compromises the legitimacy of this court. See *State* v. *Carrion*, supra, 313 Conn. 854 (*Zarella, J.*, concurring) ("invoking this authority too easily and too often can undermine the very integrity of the judicial system that this authority is designed to protect"). As the final arbiter of legal disputes in this state, there is nothing to restrain the court in its use of supervisory authority but the court itself. As long as this court allows itself to reverse judgments in individual cases under its supervisory authority, litigants cannot be sure whether we will decide such cases on the basis of our constitution, statutes, and precedent, on the one hand, or our own policy preferences, on the other. Such uncertainty erodes the predictability and public confidence that adherence to the rule of law fosters. *State* v. *Elson*, supra, 311 Conn. 771 (expansive use of supervisory authority may lead to "arbitrary, result oriented, and undisciplined jurisprudence").

Moreover, by invoking the court's supervisory authority to reverse judgments in individual cases, we contradict our continual assertion that our supervisory authority does not serve as "a last bastion of hope for every untenable appeal." (Internal quotation marks omitted.) *State* v. *Edwards*, supra, 314 Conn. 498. That is exactly what we have turned our supervisory authority into by using it, as we do in the present case, to reverse judgments in the absence of legal grounds for reversal. As long as we continue to exercise our supervisory authority in this manner, claimants will justifiably seek to prevail under the court's supervisory authority, regardless of whether their legal claims are meritorious.

In my view, these considerations significantly outweigh the aforementioned policy considerations that support the retroactive application of new rules. As I previously discussed, the interests of the party that would benefit from having the new rule applied retroactively always will be offset by the interest of the oppos-

ing party who had no notice of the new rule. Most importantly, whatever the cost to individual litigants of not applying a rule retroactively, it would be vastly outweighed by the benefits of adhering to the rule of law. With respect to our ability to supervise the judicial system, prospectively applying new rules articulated under our supervisory authority will not diminish the number of opportunities we have to do so. In the vast majority of cases, including the present case, requests to exercise our supervisory authority are accompanied by legal claims. See, e.g., *State* v. *Connor*, supra, 292 Conn. 506 (exercising supervisory authority after rejecting defendant's constitutional claims). Thus, when this court is presented with an unsuccessful legal or constitutional claim, we nevertheless will be able to recognize the need for and to implement a procedural fix by promulgating a prospective rule. Limiting our use of supervisory authority to creating only prospective rules therefore will not constrain our ability to appropriately oversee and administer the system of justice.[2] Accordingly, we no longer should invoke the court's supervisory authority to reverse judgments in the absence of independent grounds for reversal, as this practice risks "entrenching the rule of men rather than the rule of law." J. Waldron, supra, 111 Mich. L. Rev. 7.

To be sure, I do not suggest that the court never should exercise its supervisory authority. The court can properly continue to announce prophylactic procedural rules in order to ensure the sound administration of the judicial system. Such an exercise of supervisory authority does not diminish the rule of law because it does not require the court to change the outcome of an individual case on the basis of judge made rules that are essentially creatures of policy rather than the law. We properly may articulate new rules pursuant to our supervisory authority regardless of whether we are reversing a judgment on the basis of independent legal grounds raised on appeal, as long as we apply the new rule prospectively and not to the facts of the case in which it is announced. Applying new rules prospectively "ensure[s] public confidence in the integrity of the judicial system"; (internal quotation marks omitted) *State* v. *Elson*, supra, 311 Conn. 773; without contravening the rule of law.

Finally, I note that an alternative to limiting our use of supervisory authority to announce only prospective rules would be to self-impose additional limitations on the use of our supervisory authority to reverse judgments. I have no confidence, however, that this more moderate proposal would be effective. Justices of this court, including myself, have, for decades, authored dissenting and concurring opinions counseling against the excessive use of supervisory authority. See, e.g., *State* v. *Carrion*, supra, 313 Conn. 854 (*Zarella, J.*, concurring); *State* v. *Rose*, supra, 305 Conn. 629–33 (*Zarella, J.*, dissenting); *State* v. *Santiago*, supra, 245 Conn. 341,

351 (*Callahan, C. J.*, concurring in part and dissenting in part); *State* v. *Coleman*, supra, 242 Conn. 549–50 (*Norcott, J.*, concurring). As Justice Espinosa details in her concurring and dissenting opinion, those calls for restraint have gone unheeded, as the court has only exercised its supervisory authority with increasing frequency.[3] This makes it highly doubtful that additional self-imposed conditions on the use of supervisory authority would lead this court to resist the use of its supervisory authority to reverse judgments in individual cases.

In sum, I disagree with the majority that the facts of the present case warrant the use of our supervisory authority to require trial courts, in parental rights termination proceedings, to canvass parents who elect to forgo a contested trial. Furthermore, I disagree with the majority's retroactive application of that new canvass requirement in the present case and its use of its supervisory authority to reverse the judgments of the trial court on the ground that the trial court had failed to conduct such a canvass, which was not required at the time of the termination proceedings. Finally, I emphasize that, in future cases, the court should give only prospective effect to new rules articulated pursuant to its supervisory authority and not use its supervisory authority to reverse judgments in individual cases. If we are to uphold the ideal of the rule of law, we must decide cases on the basis of existing legal principles, not on the basis of our own policy judgments regarding the administration of the judicial system.

Accordingly, I respectfully concur in part and dissent in part.

[1] Further complicating this history of our inconsistent application of new rules crafted under our supervisory authority is the fact that the prospective effect of such new rules is not always clear. See *State* v. *Smith*, 275 Conn. 205, 242, 881 A.2d 160 (2005) (declining to reverse judgment when trial court had failed to heed this court's prior direction, pursuant to its supervisory authority, to discontinue use of certain jury instruction).

[2] Furthermore, the Rules Committee of the Superior Court entertains improvements to our rules of practice on an ongoing basis. Proposed improvements can be and are submitted to the Rules Committee by judges, lawyers, bar associations, members of the legislature, and members of the public, as well as other associations.

[3] Justice Espinosa offers two possible explanations for this increase: (1) a self-conferred power such as our supervisory authority "lacks limits unless [they] are self-imposed"; and (2) "after the court announced the existence of its supervisory authority in [*State* v. *Ubaldi*, 190 Conn. 559, 575, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983)], the court seems simply to have assumed its validity and has not given significant consideration to establishing and adhering to any parameters for its exercise." I agree with those explanations but would add a third possible explanation—the court in *Ubaldi*, which first established limitations on the use of the court's supervisory authority, failed to comply with its own limitations. See *State* v. *Ubaldi*, supra, 572–73. Thus, *Ubaldi*, sub silencio, fostered a low bar for future use of this court's supervisory authority.

In *Ubaldi*, the defendant, Charles F. Ubaldi, claimed that the trial court improperly had denied his motions for a mistrial after the assistant state's attorney (prosecutor) engaged in deliberate prosecutorial misconduct. See id., 561. The state claimed that, even if the prosecutor had engaged in misconduct, Ubaldi was required to prove that such misconduct was harmful in order to receive a new trial. See id., 565. The court rejected this argument and ordered a new trial pursuant to its supervisory authority; id., 575; without

determining whether the trial court had abused its discretion or whether Ubaldi had been deprived of a fair trial. See id., 564–75. As Justice Espinosa explains in her concurring and dissenting opinion, the court in *Ubaldi* apparently established that supervisory authority should be "invoked only when its exercise is necessary and the interests involved are of the utmost importance, and when an evaluation of the interests involved reveals that the balance weighs in favor of invoking the authority."

The circumstances in *Ubaldi*, however, failed to meet this standard. It unquestionably was not *necessary* to reverse Ubaldi's conviction through the use of the court's supervisory authority in order to undo the harm wrought by the prosecutor's deliberate misconduct because, as the court in *Ubaldi* acknowledged, other states deter such misconduct "through contempt sanctions, disciplinary boards or other means." *State* v. *Ubaldi*, supra, 190 Conn. 571. Additionally, in weighing the countervailing interests to reversing Ubaldi's conviction, the court failed to account for the inherent cost to the state and the judiciary in requiring them to use resources to retry a case in which the guilt of the defendant was not in doubt. Cf. *Teague* v. *Lane*, 489 U.S. 288, 310, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989) (plurality opinion) (noting cost of retrying cases after retroactive application of new rule). Because this court was unable to adhere to the limitations on the use of its supervisory authority in the very case in which those limitations were announced, it should come as no surprise that those limitations subsequently have rung hollow.